Michelle RYE et al.

v.

WOMEN'S CARE CENTER OF
MEMPHIS, MPLLC et al.

Supreme Court of Tennessee,
AT JACKSON.

March 4, 2015 Session

Filed October 26, 2015

William H. Haltom, Jr., Margaret F. Cooper, and James D. Duckworth, Memphis, Tennessee, for the appellants, Women's Care Center of Memphis, MPLLC, d/b/a Ruch Clinic, and Diane Long, M.D.

Gary K. Smith and C. Philip M. Campbell, Memphis, Tennessee, for the appellees, Michelle Rye and Ronald Rye.

W. Bryan Smith, Memphis, Tennessee, John Vail, Washington, D.C., and Brian G. Brooks, Greenbrier, Arkansas, for the ami-

cus curiae, Tennessee Association for Justice.

## OPINION

Cornelia A. Clark, J., delivered the opinion of the Court, in which Sharon G. Lee, C.J., and Jeffrey S. Bivins, J., joined. Sharon G. Lee, C.J., and Jeffrey S. Bivins, J., each filed separate concurring opinions. Gary R. Wade, J., filed a dissenting opinion. Holly Kirby, J., not participating.

We granted permission to appeal in this healthcare liability action to reconsider the summary judgment standard adopted in *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1 (Tenn. 2008). The Court of Appeals concluded that the *Hannan* standard requires reversal of the trial court's decision granting summary judgment to the defendants on certain of the plaintiffs' claims. We hereby overrule *Hannan* and return to a summary judgment standard consistent with Rule 56 of the Federal Rules of Civil Procedure. We hold, therefore, that a moving party may satisfy its initial burden of production and shift the burden of production to the nonmoving party by demonstrating that the nonmoving party's evidence is insufficient as a matter of law at the summary judgment stage to establish the nonmoving party's claim or defense. Applying our holding to the record in this case, we conclude that the defendants are entitled to summary judgment on all the plaintiffs' claims at issue in this appeal. Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand this matter to the trial court for entry of summary judgment on these issues and for any other proceedings that may be necessary.

## I. Factual and Procedural History

On February 24, 2009, Michelle Rye and her husband Ronald Rye (collectively "the Ryes" and individually "Mrs. Rye" and "Mr. Rye") filed this health care liability action against Women's Care Center of Memphis, MPLLC d/b/a Ruch Clinic ("Ruch Clinic") and Diane Long, M.D., (collectively "Defendants"). The Ryes' lawsuit arises out of obstetrical services Dr. Long and employees of Ruch Clinic rendered to Michelle Rye in 2007 and 2008, during her pregnancy with her third child, born in early January 2008.

It is undisputed that Mrs. Rye has Rh negative blood and that, as a result, she should have received a RhoGAM injection at or near the twenty-eighth week of her third pregnancy to avoid possible medical complications and risks in future pregnancies.[1] It is also undisputed that the Defendants' failure to administer a RhoGAM injection to Mrs. Rye was a deviation from the recognized standard of acceptable professional practice and that this deviation has resulted in Mrs. Rye becoming Rh-sensitized. This condition, Rh-sensitization, is irreversible and means that Mrs. Rye's blood now contains antibodies to Rh positive blood. It is undisputed that if Mrs. Rye becomes pregnant in the future and if the fetus's blood is Rh positive, it is possible that the antibodies to Rh positive

---

1. The Ryes' third child was born healthy and without complications. "RhoGAM is a trademark of a preparation of Rh immune globulin. It is used to prevent the formation of antibodies [to Rh positive blood] in Rh negative women." *Walker v. Rinck*, 604 N.E.2d 591, 593 n.1 (Ind. 1992) (citing 3 *Attorney's Dictionary of Medicine* p. R–92 (1986)). "When an Rh negative woman is pregnant with an Rh positive child, her blood develops antibodies which do not affect the [existing] pregnancy, but can cause damage to later-conceived Rh positive fetuses. An injection of RhoGAM during the first pregnancy can prevent the formation of these antibodies." *Id.* (citing 3 *Attorney's Dictionary of Medicine* at p. R–84 (1986))

blood now present in Mrs. Rye's blood will cross the placenta and attack the fetus's red blood cells. If all these contingencies occur together—a future pregnancy, an Rh positive fetus, and antibodies crossing the placenta—it is undisputed that the unborn fetus would face a number of risks, ranging from mild to severe.

In their complaint the Ryes alleged that they are "practicing Roman Catholics," and prior to learning of Mrs. Rye's Rh-sensitization and the potential risks it entails, they "had intended to have additional children." After learning of Mrs. Rye's Rh-sensitization, the Ryes inquired "about the possibility of a dispensation from the Catholic Church's traditional prohibition on sterilization procedures" but were "advised that a dispensation would not be given unless Mrs. Rye's life were in danger." Although the Ryes have since "leaned toward taking steps to prevent future pregnancies," their religious beliefs have prevented them from undergoing voluntary sterilization procedures or using other artificial means of birth control. The Ryes alleged that they have been placed in a state of emotional distress due to Mrs. Rye's Rh-sensitization and the severe risks it presents for any future pregnancies. The Ryes requested compensatory damages for (1) physical injuries to Mrs. Rye, such as the "disruption of the normal functioning of [Mrs. Rye's] capability to conceive unimpaired, healthy children, free from an abnormally high risk of birth defects or premature fetal death"; (2) the disruption of their family plans; (3) the infliction of emotional distress; and (4) medical expenses that may become necessary in the future to treat complications resulting from Mrs. Rye's Rh-sensitization.

As already noted, the Defendants admitted that their failure to administer a Rho-GAM injection at the appropriate time during Mrs. Rye's third pregnancy amounted to a deviation from the recognized standard of acceptable professional practice and that this deviation has resulted in Mrs. Rye becoming Rh-sensitized. Nevertheless, the Defendants asserted in their answer to the Ryes' complaint, and continue to contend in this Court, that the Ryes have no existing actual injuries or damages resulting from this deviation.

On July 13, 2010, after the Ryes and Dr. Long were deposed, the Defendants filed a motion to dismiss the Ryes' complaint, or in the alternative, for summary judgment. Specifically, the Defendants alleged that the Ryes have failed to establish any existing injuries, have failed to allege future injuries to a reasonable medical certainty, have alleged future damages that are "mere possibilities and speculative," have failed to allege an actual injury sufficient to support a claim for negligent infliction of emotional distress ("NIED"), and have failed to allege or to provide expert medical or scientific proof of a serious or severe emotional injury sufficient to support a "stand-alone" NIED claim.

As support for their motion, and in the statement of undisputed material facts filed along with their motion as required by Rule 56.03 of the Tennessee Rules of Civil Procedure, the Defendants relied upon the Ryes' deposition testimony admitting that Mrs. Rye "has had no medical complications as a result of not receiving a RhoGAM injection," that she "has not seen any doctor or healthcare provider or received any medical treatment whatsoever as a result of not receiving a RhoGAM injection," that although the Ryes "have been advised that there are possible complications that could occur because she did not receive a RhoGAM injection[ ], none of these complications have occurred at this time," that although the Ryes "are concerned about possible complications that might develop, they have had no emotional

or psychiatric problems because of this that required any counseling or treatment."

The Defendants also relied upon the affidavit of their expert, Dr. Thomas G. Stovall, a specialist in obstetrics and gynecology, to support their motion. Dr. Stovall, who has over twenty-five-years' experience in his specialty, opined that the health risks to an Rh-sensitized woman are "extremely remote." Dr. Stovall thus opined "within a reasonable degree of medical certainty that it is more likely than not that an Rh-sensitized individual will never sustain any injuries or damages whatsoever." Dr. Stovall also opined that "the risks to a child in a future pregnancy of an Rh-sensitized mother are remote" and that "it cannot be said with any reasonable degree of medical certainty that if an Rh-sensitized woman conceives a child, there will be any injury to the child." Additionally, Dr. Stovall opined, "within a reasonable degree of medical certainty that while Mrs. Rye [has become] Rh-sensitized, she has incurred no physical injuries." Dr. Stovall additionally opined that "[t]he risks of any future injuries to [Mrs. Rye] or to a child in a future pregnancy, if such a child is conceived, are so remote that it cannot be stated with any reasonable degree of medical certainty that such injuries would in fact occur."

In a memorandum of law filed on September 2, 2010, in response to the Defendants' motion, the Ryes stated that the Defendants' negligence had injured them by causing Mrs. Rye to become Rh-sensitized, which disrupted their family plans, increased the risks to any future children they may conceive, increased the risk to Mrs. Rye should she need a blood transfusion in the future, and caused them emotional distress, which need not be proven by expert testimony because it results from Mrs. Rye's physical injury—Rh-sensitization. Along with their legal response, the Ryes submitted the affidavit of Dr. Joseph Bruner, a specialist in perinatology, which is "a subspecialty of obstetrics," involving "maternal-fetal" care in "complicated, high-risk pregnancies." Dr. Bruner opined that the Defendants' failure to administer a RhoGAM injection to Mrs. Rye amounted to a deviation from the recognized standard of acceptable professional practice and caused Mrs. Rye to become Rh-sensitized. Dr. Bruner characterized Rh-sensitization as an injury, explaining that, "[b]iologically, [Mrs. Rye] is not the same person she was before she became Rh-sensitized." According to Dr. Bruner, "[w]hen [Mrs. Rye] began her third pregnancy, she had normal blood, without the antibodies she now has in her system for life." Dr. Bruner stated that Mrs. Rye "now possesses diseased blood with antibodies introduced into her bloodstream through no fault of her own, a situation which would not have occurred had she been given a timely RhoGAM injection." Dr. Bruner stated that Mrs. Rye's Rh-sensitization has created "two areas of concern going forward"—the risks of harm to Mrs. Rye and the risks of harm to the Ryes' unborn children.

With regard to the risks of harm to Mrs. Rye, Dr. Bruner testified as follows:

[I]f Mrs. Rye is involved in a medical emergency henceforth in which she will require a blood transfusion, she is at an increased risk of life-threatening problems. This is directly attributable to the fact that she has antibodies present in her blood which were not present before she became Rh-sensitized. Ordinarily, in an average hospital emergency treatment setting, it takes an average of 20 to 30 minutes for a blood typing and cross matching to occur. A shorter procedure, a blood type and screen, can be done approximately 10 minutes faster.

The presence of Rh antibodies in Mrs. Rye's blood will double or even triple the time necessary to identify compatible units of blood for transfusions. This time difference is likely to be life threatening in an emergency situation in which blood transfusions are required. This is of particular significance because major accidents and traumatic events often occur in situations in which sophisticated medical care is not immediately physically available and time is typically of the essence to save a patient who needs an emergency transfusion or multiple transfusions.

With regard to the risks of harm to any future children the Ryes may conceive, Dr. Bruner opined:

[Rh-sensitization] can have severe consequences because of the destruction it involves of the baby's blood cells. The baby's body tries to compensate for the anemia caused by the attack from the mother's antibodies by releasing immature red blood cells, called erythroblasts. The overproduction of erythroblasts can cause the liver and spleen to become enlarged, potentially causing liver damage or a ruptured spleen. Excess erythroblast production means that fewer of other types of blood cells are produced, such as platelets and other factors important for blood clotting. Therefore, excessive bleeding can be another complication. The destroyed red blood cells release the blood's red pigment (hemoglobin) which degrades into a yellow substance called bilirubin. Bilirubin is normally produced as red blood cells die, but the body can only handle a low level of bilirubin. In erythroblastosis fetalis, high levels of bilirubin accumulate and cause hyperbilirubinemia, a condition in which the baby becomes jaundiced before birth, developing a yellowish tone of the eyes and skin. If hyperbilirubinemia cannot be controlled in the newborn, the baby develops kernicterus after birth, in which bilirubin is deposited in the brain and may cause permanent damage. Other symptoms include high levels of insulin and low blood sugar, as well as a condition called hydrops fetalis. Hydrops fetalis causes fluids to accumulate within the baby's body, causing swelling before birth which can even cause fetal death. Hydrops fetalis inhibits normal breathing after birth and can interfere with lung growth if it continues for an extended period. Hydrops fetalis and anemia can also contribute to heart problems.

Babies of Rh-sensitized mothers who survive pregnancy may develop kernicterus, which can lead to deafness, speech problems, cerebral palsy, or mental retardation. Extended hydrops fetalis can inhibit lung growth and contribute to heart failure. These serious complications are life threatening, but with good modern medical treatment, most babies can be saved.

. . . .

I have been made aware that Mr. and Mrs. Rye are Roman Catholics and, because of their religious views, cannot undergo voluntary sterilization and do not practice birth control other than through attempted timing of sexual relations since Mrs. Rye became Rh-sensitized. However, I am also aware that pregnancies can and do occur for couples in such circumstances despite their best efforts to avoid a pregnancy, and I have been made aware that the Ryes are opposed to abortion and do not plan to have an abortion in the event of a subsequent pregnancy.

I have reviewed the Affidavit of Dr. Thomas Stovall in this case. Contrary to the opinions of Dr. Stovall, it is my opinion that it is more probable than not

that unborn children of Mr. and Mrs. Rye will experience complications in a subsequent pregnancy or in subsequent pregnancies, and the degree of severity of those complications will be expected to increase with successive pregnancies because of the nature of Rh-sensitization as a condition. This is an impairment of the ability of Mrs. Rye to bear children in the future free from a series of risks the family more than likely would not have had otherwise.

Based upon my experience, education and training as a perinatologist, the usual course of treatment for the first pregnancy in a woman known to be Rh-sensitized is an amniocentesis (aspiration of fluid by needle) at 15 weeks gestation to determine the fetal blood type and confirm whether the baby is in fact Rh-positive. Assuming the baby is Rh-positive, which is more likely than not given Mrs. Rye's history, starting at 24 weeks gestation, serial amniocenteses would be expected to be conducted approximately every 3 weeks at 27, 30, 33, 36 and possibly 39 weeks gestation. Each amniocentesis carries a 1 to 2 % risk of bleeding, infection, leakage of fluid, preterm labor, and loss of the fetus, and with each amniocentesis there are expenses, discomfort to the mother because of the insertion of a needle in the abdomen, and the emotional toil, and the risk of a baby having to be delivered preterm, with accompanying risks of cerebral palsy.

A potential alternative to serial amniocenteses, or an adjunct to amniocenteses, would be one or more ultrasounds. Ultrasounds can enable the practitioner to measure fetal blood velocity effectively. Babies with a normal blood count will have blood moving at a certain speed, which is a normal velocity. The presence of anemia in a developing fetus can therefore be detected through the observation of abnormal blood velocity at approximately 22 to 24 weeks gestation, and in a developing child of an Rh-sensitized mother where anemia has been observed. A practitioner who uses ultrasounds as the principle means of monitoring such a child should conduct those ultrasounds every one to two weeks prior to delivery. The factors that influence the decision of the practitioner as to whether to do ultrasound or amniocentesis include individual risk factors as identified by the practitioner, the family's geographic access to available care, the facilities and equipment available and the level of experience and training of the doctor.

In a subsequent pregnancy, Michelle Rye's unborn child will, at a minimum, require monitoring as described above to a reasonable medical certainty. In later pregnancies, because of the nature of Rh-sensitization and the immune system's response in an Rh-sensitized patient, the risks to the babies will magnify significantly with successive pregnancies.

Based upon my education, training and experience as a perinatologist specializing in the treatment of high risk maternal-fetal patients, including treatment of many pregnant women who have been Rh-sensitized and their developing babies, the pregnancies of Rh-sensitized patients can be grouped into three broad risk categories: (1) "mild disease," in which the child will be born with minimal jaundice expected to resolve with conventional treatment shortly after birth and no need for blood transfusions, (2) "moderate disease," which will tend to involve prematurity and some degree of anemia and will require a prolonged stay in a neonatal treatment facility and blood transfusions and the use of light therapy to improve

the babies' bilirubin; and (3) "severe disease," which will require aggressive treatment of the baby in utero, including monitoring of hematocrit which will fall below a level of 15–20, and will likely be accompanied by erythroblastosis fetalis and hydrops fetalis, a very serious condition in which excess fluid accumulates around the baby's lungs, heart, and organs. Developing babies in this "severe disease" category are considered high risk, and I am often called upon in my practice as a perinatologist to provide consultation and aggressive treatment and intervention for such patients. Aggressive treatment for such babies includes many invasive diagnostic procedures and blood transfusions while the babies are still in utero. Despite the best care, such affected babies have a significantly higher risk of prematurity and temporary and permanent complications, including respiratory and central nervous system deficits, and even death.

Based upon my education, training and experience as a perinatologist specializing in the treatment of high risk maternal-fetal patients, including treatment of many pregnant women who have been Rh-sensitized and their developing babies, I have observed certain percentages of disease and risk classification. Generally, many of the children born in the first pregnancy of women after they have been Rh-sensitized will fall into the first category (mild disease), while approximately 25 to 30% of those children will fall into the second category (moderate disease), and approximately 20 to 25% of those children will fall into the third category (severe disease). However, it is my opinion that it is more probable than not that the unborn children of Mr. and Mrs. Rye will be at a greater than average statistical risk for the reasons set forth below.

Fortunately, Mr. and Mrs. Rye's third child ... was born healthy and without adverse events. However, because of Mrs. Rye's comparatively quick Rh-sensitization (from the 28th week of her third pregnancy up until the confirmation of her Rh-sensitive status shortly after the delivery of her third child), it is my opinion to a reasonable degree of medical certainty that Mrs. Rye is a comparatively "fast responder" biologically to the changes brought about by Rh-sensitization among Rh-sensitized patients. This temporal pathway for her Rh-sensitization was prompt and the condition is now irreversible. The antibodies now contained in her body, which were not present before her Rh-sensitization, will never go away during her lifetime. It is therefore my opinion that it is more probable than not that Mrs. Rye's next pregnancy will involve a baby with moderate to severe disease in utero.

The Defendants deposed Dr. Bruner on November 29, 2010. During his deposition, Dr. Bruner elaborated on his affidavit testimony concerning the risks to Mrs. Rye and to any unborn children the Ryes may conceive in the future. Excerpts of his deposition testimony appear below.

Q. Okay. You and I are communicating. Let me make it clear. I've asked you if you're called as an expert in this case what opinions you will render, and you've told me that your testimony—tell me if I state this correctly—your testimony would be about the risk that Mrs. Rye has and any unborn child of her[s] would have if another child were conceived. Did I make that statement correctly: That's the subject matter of your testimony?

A. That's correct.

Q. All right. And, specifically, I hear you say three points. Number one, that Mrs. Rye became R[h-]sensitized in her third trimester of her last pregnancy because of the failure to receive a RhoGAM injection; number two, she now has lifetime risks, whether she becomes pregnant again or not; and number three, if she becomes pregnant again, she and her fetus will have risks.

A. That's correct.

Q. Did I state those correctly?

A. Yes, you did.

. . . .

Q. All right. Now, I want to give you every opportunity before we leave here today to tell me the basis in each of those areas, so go ahead.

A. Okay. As far as the sensitization, itself, everything I've read so far, there appears to be general agreement that she was sensitized in her last pregnancy because of her doctor's failure to administer RhoGAM, so I don't think we need to spend much time on that.

Her lifetime risk is because of the fact that the R[h] disease she now has, that she has circulating antibodies to the R[h] factor. If she ever requires a blood transfusion or requires a blood product in the future, it will be necessary for her to be administered blood or blood products that do not have the R[h]factor, or else it would provoke a response in her body.

. . . .

So this is only a risk if she is in an emergency situation, for example, if she's in a motor vehicle accident, or if she falls down the stairs or has some sort of injury, perhaps even during a childbirth that would result in a large acute blood loss that requires an urgent or emergent blood transfusion as a life-saving procedure. Then the risk for her is that the turnaround time to produce compatible blood may not be fast enough to prevent injury or even death.

. . . .

Q. And I'm not—when I say this, I'm just trying to nail it down. You're not going to testify at this trial that she has any—if you're called as a witness at this trial, that she has currently any other risk in her current, nonpregnant situation, any other risks than the risk, if she had blood loss, of the transfusion process being prolonged, correct?

A. That's the only medical risk that she has, yes, sir.

. . . .

Q. On the current risk that she has, the only risk that she has right now in her current situation, is this risk that it might take longer to process her blood in the case of—or blood products in the case of a transfusion?

A. It would take longer to process a unit of blood.

. . . .

Q. Fair enough. Let's go to your third opinion. You say if she becomes pregnant, she and her fetus both have risks. Tell me specifically what your opinions are in this regard.

A. Well, there are risks from the disease, and there are risks from the treatment of the disease. The risk of the disease centers mainly on the fetus. With her next R[h] incompatible pregnancy, her immune response will be stronger than it was in her last pregnancy, so she will produce antibodies that will cross

the placenta, and they will attach to the fetal red blood cells. And these red blood cells will be destroyed, and the fetus will experience some degree of anemia.

Q. Okay. Anything else?

A. Depending on the degree of anemia, the fetus may be required—in order to replace the blood cells that are being destroyed, the fetus ma[y] be required to convert other organs that do not normally produce blood into blood-producing organs, specifically, the liver, the spleen, under severe circumstances, even the lining of the bowel. The conversion of these cells being forced to do something they were not normally programmed to do is injurious.

Q. Injurious to the fetus?

A. Yes, injurious to the cells, injurious to the organ and injurious to the entire fetus. And this injury can lead to an accumulation of fluid within the fetus because of impaired blood flow and eventually to a condition known as hydrops fetalis....

Q. What is that?

A. It's a collection of fluid in more than one body space in a fetus as a result of severe anemia, provoked by an immune response.

Q. Okay.

A. Left untreated, this may lead to fetal death.

Q. Left untreated?

A. Yes.

Q. What if it's treated?

A. Then a variety of outcomes are possible. Left untreated, and even if treated, it can lead to maternal illness. The way this happens is, if the fetus develops hydrops fetalis, the placenta does, also, because the placenta belongs to the fetus. And in descriptions—in pathological descriptions of fetuses that have been sick with hydrops fetalis or have died, one common feature is a very thick placenta, a placenta that's also hydropic. The placenta produces many basal-active substances, not only for the fetus, but ones that affect the mother, as well. So when the placenta becomes thick and edematous, the mother commonly develops high blood pressure, fluid retention and proteinuria, something very closely akin to preeclampsia, and so the mother becomes sick, as well.

Q. Go ahead. What else?

A. Well, if left untreated, this will typically result in death of the fetus if it's that severe.

Q. If left untreated?

A. Yes.

Q. Okay.

A. So those are the risks to the fetus from the disease process. So this can result in an early loss, it can result in a loss after viability, it can result in an emergency delivery that, unfortunately, may result in the loss of the baby, in spite of the emergency delivery.

And so the mother may secondarily be injured because of the disease process that the fetus has or because of the treatment of the disease....

....

A. Finally, as I mentioned, all of these procedures, all of these invasive procedures have complications. And although it's probably not worthwhile going through every scenario, just by way of illustration, it's possible that an amniocentesis or blood sampling could be performed at 23 weeks, 24 weeks, a

complication could occur, the baby would deliver and survive but then be severely affected by prematurity, which is not a result of the disease process, but a complication of the treatment of the disease. And the baby could survive and be severely affected with cerebral palsy or even mental retardation and then live for [forty] years after that.

So that pretty much sums up the risks of the fetus and the mother, both from the disease and from the treatment. . . .

. . . .

Q. Okay. So you can't say it's more likely than not that if she becomes pregnant again, and if the—and if the baby has blood incompatible with her R[h] [negative] status that the baby is not going to be treated for this?

A. No.

Q. You're not saying that?

A. In this country, more than likely, she would get treatment.

Q. All right.

A. But the interlude until treatment begins may result in a pregnancy loss.

Q. But that's not a risk that you're prepared to testify that more likely than not is going to occur?

A. No, I don't think so.

Q. Can you say that any of these things you've told us about today are more likely than not going to occur to her in the future?

A. Yes.

Q. What? How can you say that?

A. It's more likely than not that she will become pregnant with another sensitized pregnancy.

Q. Okay. And what is the basis for your statement that this lady, it's

more likely than not that she's going to become pregnant again with a child that will have blood not compatible with her R[h] [negative] status?

A. Because of her religious beliefs, she's not allowed to practice contraception, so she and her husband are still having unprotected intercourse.

Q. How do you know that?

A. Because she testified to that in her deposition. So at least—

Q. And you're working on the assumption that there's unprotected intercourse going on now. You're working on that assumption?

A. Well, she testified under oath that there was unprotected—

Q. But you're testifying that's an accurate statement?

A. Yeah, I am.

. . . .

Q. And she's—more likely than not, it's going to be a child whose blood is not compatible with her R[h] [sensitized] status. You're saying that's more likely than not, more than a 50[%] chance of that?

A. That's correct.

. . . .

A. So more likely than not, she will become pregnant again, because she's already become pregnant three times, having unprotected intercourse. More likely than not, the fetus will be affected in at least one or more future pregnancies because of the simple fact that R[h-]positive men, 40[%] are homozygous, 60[%] are heterozygous. Over all, there's a 70[%] chance her pregnancy will be affected. . . .

. . . .

Q. But that's as far as you can go. It's more likely than not that she'll get pregnant, and it's more likely than not that the baby will have blood incompatible, and it's more likely than not that that will mean that the baby will have some—some what?

A. Let me try to be more specific.

Q. Thank you.

A. Okay. So it's more likely than not, she'll become pregnant. It's more likely than not, the baby will be incompatible. It's more likely than not, the disease will be moderate to severe, which means that more likely than not, invasive procedures will begin in the late second trimester, between 24 and 28 weeks, and these invasive procedures will occur every seven to ten days, more or less, for the remainder of the pregnancy, each of those events with a one-to-two percent risk.

Dr. Stovall was deposed on February 24, 2011. During his deposition, Dr. Stovall reiterated the opinion he had previously expressed in his affidavit, that, while Mrs. Rye has become Rh-sensitized, she has not incurred physical injury or sustained damages as a result of the Rh-sensitization. Dr. Stovall testified that unless she becomes pregnant again, there is no risk at all to Mrs. Rye from the Rh-sensitization. Dr. Stovall agreed that, if Mrs. Rye becomes pregnant in the future and the fetus dies or suffers from cerebral palsy or some other serious complication from the Rh-sensitization, the Ryes would, at that point, have suffered harm from the Defendants' failure to administer a RhoGAM injection. Dr. Stovall further testified that if Mrs. Rye becomes pregnant in the future, there is a 40% chance "that she will develop enough antibodies that those antibodies will cross the placenta and cause the baby to have or to require the baby to have additional monitoring." Even if additional monitoring is required, however, Dr. Stovall testified that "more likely than not, like overwhelmingly—overwhelmingly, more likely than not, [Mrs. Rye] would not have any complications."

On July 15, 2011, the trial court held a hearing on the Defendants' motion to dismiss, or in the alternative, for summary judgment. At the conclusion of the hearing, the trial court announced its decision to grant the Defendants' motion as to all claims for future damages to Mrs. Rye arising from blood transfusions or future pregnancies. On August 10, 2011, the trial court, consistent with its bench ruling, entered an order granting the Defendants' motion as to "all claims for future damages for injuries to [Mrs.] Rye that relate to prospective injury relating to blood transfusions or future pregnancies." The trial court found that such damages had yet to be sustained and that "it is a matter of speculation whether they will ever be sustained." The trial court denied the Defendants' motion on the issues of whether the Ryes "ha[d] suffered emotional distress and [whether Mrs.] Rye has R[h] disease because of the claimed negligence of the [D]efendants." However, during the July 15, 2011 hearing, the trial court invited the Defendants to renew their motion for summary judgment after discovery had been completed. A scheduling order the trial court entered on March 10, 2011, provided the following 2011 discovery deadlines: April 1—written discovery; May 1—disclosures of the Ryes' expert witnesses; June 1—disclosures of the Defendants' expert witnesses; July 1—fact witness depositions and discovery depositions of the Ryes' expert witnesses; August 1—amended pleadings; September 1—discovery depositions of defense experts.

On January 24, 2012, after the discovery deadlines had passed and approximately two weeks prior to the scheduled trial date, the Defendants renewed their request for dismissal or summary judgment by filing a supplemental memorandum in support of their motion. The Defendants again argued that Mrs. Rye has no present injury or illness as a result of their failure to administer a RhoGAM injection. The Defendants argued that the Ryes' allegations regarding emotional distress amount to "stand-alone" NIED claims requiring expert proof of a severe or serious emotional injury and that the Ryes had "developed no proof to support [their] claim[s]." According to the Defendants, the Ryes "ha[d] been given ample opportunity to develop proof in this case that they have, in fact, sustained actual damages as a result of the failure of the [D]efendants to administer a RhoGAM injection. The [Ryes] have proved no such damages."

The trial court heard arguments on the Defendants' renewed motion on the morning of February 6, 2012—the date trial was scheduled to begin. The trial court reaffirmed its earlier ruling that a genuine dispute of material fact existed as to whether Mrs. Rye's Rh-sensitization constituted a physical injury for purposes of her NIED claim, citing Dr. Bruner's testimony that there had "been a change in her blood." However, the trial court concluded that the undisputed facts showed that Mr. Rye had sustained no physical injury. As a result, the trial court ruled that Mr. Rye has no independent cause of action and dismissed Mr. Rye's NIED claim. Counsel for the Ryes then orally moved the trial court to grant an interlocutory appeal. The trial court agreed to do so and indicated that it would permit the parties to seek an interlocutory appeal on all issues that had been addressed in its rulings on the Defendants' motion.

On November 28, 2012, the trial court entered an order consistent with its bench ruling. Specifically, the trial court denied the Defendants' summary judgment on the issue of whether Mrs. Rye had suffered a physical injury for purposes of her NIED claim. The trial court clarified that Mrs. Rye would not be precluded "from presenting evidence of how her family plans [had] changed as an element of damages going to emotional distress." The trial court granted the Defendants summary judgment with regard to: (1) Mr. Rye's "stand-alone" NIED claim that was not supported by the required expert testimony; and (2) the Ryes' independent cause of action for disruption of family planning.

On December 26, 2012, the Ryes filed a motion in the trial court seeking permission to pursue an interlocutory appeal on six issues. Two days later, the Defendants filed their own motion seeking the trial court's permission for an interlocutory appeal on two issues. On March 22, 2013, the trial court entered separate orders granting both motions and listing five of the six issues requested by the Ryes and both of the issues requested by the Defendants. Thereafter, the Ryes and the Defendants filed separate Tennessee Rule of Appellate Procedure 9 applications for permission to appeal.

On May 24, 2013, the Court of Appeals granted both applications and limited its review to the following issues:

1. Since the Defendants have admitted that the failure to provide a RhoGAM injection to [Mrs.] Rye was a deviation from the recognized standard of acceptable professional obstetric and gynecological practice, whether the trial court properly granted partial summary judgment to the Defendants as to the [Ryes'] claims that the Ryes' future children are at risk for complications and [Mrs.] Rye is at risk for harm in the event of future

blood transfusions as set forth in the Affidavit and deposition testimony of [Dr.] Bruner [ ], based upon the court's findings that such risks are too speculative to be submitted to the jury;

2. Whether the trial [c]ourt properly denied summary judgment to the Defendants as to claims that [Mrs.] Rye has "diseased blood" or Rh disease and therefore has an injury in the form of an altered bodily status;

3. Whether the trial [c]ourt properly denied summary judgment to the Defendants as to the claim that [Mrs.] Rye has suffered emotional distress, as such claim is not a "stand-alone" [NIED] claim under Tennessee law;

4. Whether the trial [c]ourt properly granted summary judgment to the Defendants as to the claim that [Mr.] Rye has suffered emotional distress, as such claim is a "stand[-]alone" [NIED] claim under Tennessee law; and,

5. Whether the fundamental right of procreation in Tennessee articulated in Tennessee case law, *e.g. Davis v. Davis*, 842 S.W.2d 588, 600–01 (Tenn. 1992), confers any right of action or remedial damages for disruption of family planning due to impairment of reproductive capacity, and whether the right belongs only to a woman or also to a man.

Because this lawsuit was filed in 2009, the Court of Appeals evaluated the trial court's ruling on the Defendants' summary judgment motion pursuant to the standards adopted in *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), rather than the standards in Tennessee Code Annotated section 20–16–101 (Supp. 2014), which applies to actions filed on or after July 1, 2011.[2] *Rye v. Women's Care Ctr. Of Memphis, MPLLC*, No. W2013–00804–COA–R9–CV, 2014 WL 903142, at *5 n.9

(Tenn. Ct. App. Mar. 10, 2014). The Court of Appeals affirmed in part and reversed in part the trial court's ruling. Specifically, the Court of Appeals affirmed the denial of summary judgment on the issue of whether Mrs. Rye has suffered a physical injury entitling her to bring a stand-alone NIED claim, without supporting the claim with expert proof. *Id.* at *8, 20. The Court of Appeals also affirmed the trial court's grant of summary judgment to the Defendants on the Ryes' independent cause of action for disruption of family planning and Mrs. Rye's claim for future medical expenses associated with possible future blood transfusions. *Id.* at *13–16. Nevertheless, the Court of Appeals reversed the trial court's grant of summary judgment to the Defendants on Mrs. Rye's claim for future medical expenses associated with future pregnancies and on Mr. Rye's NIED claim. *Id.* at *11–12, *24. With respect to Mrs. Rye's claim for future medical expenses associated with future pregnancies, the Court of Appeals was "reluctant to conclude" that Mrs. Rye's proof was "anything more than contingent and speculative." *Id.* at *11. The Court of Appeals explained, however, that *Hannan* had "created a particularly high standard" for defendants seeking summary judgment, *id.* and concluded that the Defendants had failed to "disprove[ ]" an essential factual claim and thus had failed to meet the high *Hannan* standard. *Id.* at *12. The Court of Appeals agreed with the trial court that Mr. Rye had alleged only a "stand-alone" NIED claim, which requires expert proof to prevail at trial. Nevertheless, based on the "high burden of the *Hannan* standard," *id.* at *24, the Court of Appeals held "that Mr. Rye's failure to submit expert proof to support his NIED claim prior to the trial in this

2. Act of May 20, 2011, ch. 498, 2011 Tenn. Pub. Acts § 3 at 471.

case is not sufficient to support a grant of summary judgment." *Id.*

The Defendants filed an application for permission to appeal from the Court of Appeals' decision, pursuant to Tennessee Rule of Appellate Procedure 11. This Court granted the Defendants' application, and, in addition to the issues raised in the application, directed the parties to address the question of whether the summary judgment standard articulated in *Hannan* should be reconsidered. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, No. W2013–00804–SC–R11–CV (Tenn. Sept. 19, 2014) (order directing the parties to brief whether *Hannan* should be reconsidered).

## II. Analysis

### A. Standard of Review

■ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing

*Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)). Before making a fresh determination in this appeal, we must first identify the standards that guide our de novo review. To do so, we will review the history of summary judgment, including the adoption of Rule 56 of the Tennessee Rules of Civil Procedure ("Tennessee Rule 56"), the three seminal decisions of the United States Supreme Court[3] discussing the standards that apply in summary judgment practice, the decision in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), and the confusion it engendered, and reconsider whether the standard articulated in *Hannan* is consistent with the history of summary judgment and the text of Tennessee Rule 56.

### B. History of Summary Judgment in Tennessee

#### 1. Adoption of Tennessee Rule of Civil Procedure 56

The comprehensive history of summary judgment practice in Tennessee has been provided in prior decisions of this Court and in law review articles. *See, e.g., Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993); Judy M. Cornett, *Trick or Treat? Summary Judgment in Tennessee after Hannan v. Alltel Publishing Co.*, 77 Tenn. L.Rev. 305 (2010) [hereinafter Cornett's *Summary Judgment in Tennessee*]. For purposes of this appeal, the following historical overview will suffice.

Summary judgment in the modern sense first became available in Tennessee on January 1, 1971, with the adoption of Tennessee Rule 56. *Allstate Ins. Co. v. Hart-*

---

3. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). These three decisions are known collectively as "the trilogy." Adam N. Steinman, *The Irrepressible Myth of Celotex: Reconsidering Summary Judgment Burdens Twenty Years After the Trilogy*, 63 Wash. & Lee L.Rev. 81, 82 (2006). We will refer to these decisions as the *Celotex* trilogy in this opinion.

*ford Accident & Indem. Co.,* 483 S.W.2d 719, 719 (Tenn. 1972); *see also Byrd,* 847 S.W.2d at 210. At the time of its adoption, Tennessee Rule 56 was essentially identical to the corresponding Rule 56 of the Federal Rules of Civil Procedure ("Federal Rule 56") then in effect. Tenn. R. Civ. P. 56.01 advisory commission cmt.; *Bowman v. Henard,* 547 S.W.2d 527, 530 (Tenn. 1977). Tennessee Rule 56 was hailed as "one of the most important and desirable additions to Tennessee procedure contained in the Rules of Civil Procedure" and described as "a substantial step forward to the end that litigation may be accelerated, insubstantial issues removed, and trial confined only to genuine issues." *Byrd,* 847 S.W.2d at 210 (quoting Tenn. R. Civ. P. 56 advisory commission cmt.) (internal quotation marks omitted); see also Donald W. Pemberton, *Tennessee Rules of Civil Procedure,* 4 Mem. St. U.L.Rev. 211, 215 (1974); Donald F. Paine, *Recent Developments in Tennessee Procedure: The New Tennessee Rules of Civil Procedure,* 37 Tenn. L.Rev. 501, 516 (1970). Early decisions construing Tennessee Rule 56 likewise emphasized the importance of summary judgment as a rapid and inexpensive means of resolving issues and cases where no genuine issues of material fact existed. *See, e.g., Bowman,* 547 S.W.2d at 529; *Evco Corp. v. Ross,* 528 S.W.2d 20, 24 (Tenn. 1975).

### 2. The *Celotex* Trilogy

Tennessee Rule 56 remained essentially identical to its federal progenitor in 1986, when the United States Supreme Court issued the *Celotex* trilogy addressing summary judgment practice under Federal Rule 56. In *Matsushita Electric Industrial Company v. Zenith Radio Corporation,* decided first, the Supreme Court elaborated on the showing required for a plaintiff to survive a summary judgment motion. The Court observed that, when the moving party carries its "burden under Rule 56(c)," then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" 475 U.S. at 586, 106 S.Ct. 1348 (quoting Fed. Rule Civ. Proc. 56(e)). To satisfy this burden, the nonmoving party must do "something more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Further, the Court explained that, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

In *Anderson,* the Court explained the role the burden of proof at trial plays in summary judgment practice and how the substantive law regarding a claim or defense affects the determination of which facts are "material" and which factual disputes are "genuine" for purposes of Rule 56. 477 U.S. at 247–48, 106 S.Ct. 2505. The Court stated that "the substantive law will identify which facts are material" and clarified that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. Materiality, the Court explained, is "only a criterion for categorizing factual disputes in their relation to the legal elements of the claim, and not a criterion for evaluating the evidentiary underpinnings of those disputes." *Id.* The Court emphasized that disputes of material fact are "genuine"—and therefore preclude the entry of summary judgment—only if the evidence produced at the summary judgment stage "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court held

that this standard "mirrors the standard for a directed verdict." *Id.* at 250, 106 S.Ct. 2505. Accordingly, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment ... based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. *Anderson* instructed that summary judgment may be granted when the evidence supporting the plaintiff's claim "is merely colorable or is not significantly probative." *Id.* at 249–50, 106 S.Ct. 2505 (citation omitted). The Court further explained:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

*Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (quoting *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872)).

In these first two cases of the *Celotex* trilogy, the Court assumed without deciding that the moving defendants had met their initial burdens under Federal Rule 56. *Anderson,* 477 U.S. at 250 n.4, 106 S.Ct. 2505; *Matsushita Elect. Indus. Co.,* 475 U.S. at 586 n.10, 106 S.Ct. 1348. In *Celotex,* decided the same day as *Anderson,* the Supreme Court had the opportunity to address the burden of production a moving party bears in summary judgment practice.

Mrs. Catrett sued in September 1980, alleging that her husband's death had resulted from his exposure to products containing asbestos manufactured or distributed by Celotex and other named corporations. *Celotex,* 477 U.S. at 319, 106 S.Ct. 2548. A year after the suit was filed, Celotex moved for summary judgment, contending that Mrs. Catrett had "failed to produce evidence" showing that any Celotex product "was the proximate cause" of her husband's wrongful death. *Id.* Celotex did not support its motion with affidavits but instead based its motion on Mrs. Catrett's *"failure to identify,* when answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to [Celotex's] asbestos products." *Id.* at 320, 106 S.Ct. 2548. Mrs. Catrett responded to Celotex's summary judgment motion with three documents, including a transcript of her husband's deposition, a letter from an official of one of her husband's former employers whom Mrs. Catrett planned to call as a trial witness, and a letter from an insurance company to Celotex's attorney. *Id.* According to Mrs. Catrett, all of these documents suggested that her husband had been exposed in 1970 and 1971 to asbestos products that were manufactured by Celotex. *Id.* Celotex asked the federal district court not to consider Mrs. Catrett's response because the three documents she supplied amounted to inadmissible hearsay. *Id.* In July 1982, the federal district court granted Celotex's motion for summary judgment, and Mrs. Catrett appealed. *Id.* at 321–22, 106 S.Ct. 2548. The Circuit Court of Appeals for the District of Columbia reversed and held that the summary judgment motion was fatally defective because Celotex had " 'made no effort to adduce any evidence, in the form of affidavits or otherwise, to sup-

port its motion.'" *Id.* at 321, 106 S.Ct. 2548 (emphasis in original omitted). The Court of Appeals did not address whether Mrs. Catrett's response to the motion had been sufficient.

The Supreme Court granted certiorari and ultimately reversed the Circuit Court of Appeals' judgment and remanded to that court for further proceedings. *Id.* at 328, 106 S.Ct. 2548. Although the Court was split five-to-four on the decision to reverse the Court of Appeals, eight of the nine justices agreed on how the burdens of production and persuasion should function in summary judgment practice. *See Id.* at 322–27, 106 S.Ct. 2548 (Rehnquist, J., majority opinion); *Id.* at 328, 106 S.Ct. 2548 (White, J., concurring); *Id.* at 329, 334, 106 S.Ct. 2548 (Brennan, J., dissenting). [4] The justices disagreed only as to the result that should pertain when the agreed upon standards were applied to the facts of the case.

Justice Rehnquist, writing for the majority, stated:

> We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure. Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.* In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

> . . . .

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment *"with or without supporting affidavits"* (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its sum-

---

**4.** Justice Stevens also dissented in *Celotex,* but he did not discuss in detail summary judgment practice under Federal Rule 56. *See*

477 U.S. at 337, 106 S.Ct. 2548 (Stevens, J., dissenting).

mary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied.

477 U.S. at 322–23, 106 S.Ct. 2548 (first emphasis added) (footnote omitted) (quoting Fed. R. Civ. P. 56). The *Celotex* majority emphasized that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Where the moving party satisfies this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 56(e)). However, a nonmoving party need not "produce evidence in a form that would be admissible at trial" or "depose her own witnesses" to survive a summary judgment motion. *Id.* "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing" required to avoid summary judgment. *Id.* The majority also pointed out that a nonmoving party confronted with a "premature motion for summary judgment" may invoke Federal Rule 56(f), which, at that time, "allowe[d] a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party ha[d] not had an opportunity to make full discovery." *Id.* at 326, 106 S.Ct. 2548. A summary judgment motion "may, and should, be granted," the *Celotex* Court reiterated, "so long as whatever is before

the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548. The *Celotex* Court emphasized that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. 2548 (quoting Fed. R. Civ. P. 1). Accordingly, the *Celotex* majority declared that Federal Rule 56 should "be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* The Supreme Court remanded the case to the Circuit Court of Appeals to consider the adequacy of the three documents Mrs. Catrett had submitted in response to Celotex's motion. *Id.*

Justice White, who supplied the fifth vote for the majority decision, also filed a short concurring opinion, in which he agreed that "the Court of Appeals was wrong in holding that the moving defendant must always support [its] motion with evidence or affidavits showing the absence of a genuine dispute about a material fact." 477 U.S. at 328, 106 S.Ct. 2548 (White, J., concurring). Justice White also concurred with the majority that a defendant moving for summary judgment "may rely on depositions, answers to interrogatories, and the like, to demonstrate that the plaintiff has no evidence to prove his case and hence that there can be no factual dispute." *Id.* Justice White emphasized, however, that "[i]t is not enough to move for summary

judgment *without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.*" *Id.* (emphasis added). Justice White cautioned that, although a nonmoving party may be required to respond to a summary judgment motion, "he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit." *Id.* Justice White concurred in reversing and remanding to the Court of Appeals for consideration of the adequacy of Mrs. Catrett's response to Celotex's motion. *Id.* at 329, 106 S.Ct. 2548. Justice White agreed to this disposition because Celotex had conceded that, if Mrs. Catrett had named a witness to support her claim, summary judgment would have been inappropriate unless Celotex somehow showed "that the named witness'[s] possible testimony raise[d] no genuine issue of material fact" and because Mrs. Catrett had not argued that she had no obligation to reveal her witnesses and evidence but had instead insisted "that she ha[d] revealed enough to defeat the motion for summary judgment" by her three-document response. *Id.* at 328, 106 S.Ct. 2548.

Justice Brennan filed a dissenting opinion in *Celotex,* which Chief Justice Burger and Justice Blackmun joined. *Id.* at 329, 106 S.Ct. 2548 (Brennan J., dissenting). Although Justice Brennan did *"not disagree* with the Court's legal analysis," he dissented from "the Court's judgment" because he believed that Celotex had not met "its burden of production under Federal Rule of Civil Procedure 56." 477 U.S. at 329, 106 S.Ct. 2548 (Brennan, J., dissenting) (emphasis added). Justice Brennan also faulted the Court for "not clearly explain[ing] what is required of a moving party seeking summary judgment on the

ground that the nonmoving party cannot prove its case." *Id.* Justice Brennan used his dissenting opinion "to explain more clearly" what is required in such circumstances, stating as follows:

> If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Second, the moving party may demonstrate to the [c]ourt that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.* If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party—who will bear the burden of persuasion at trial—has no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. Rather, *as the Court confirms,* a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. *If there is literally no evidence in the record, the moving party may demonstrate this by review-*

*ing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record.* Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion. Accordingly, the nonmoving party may defeat a motion for summary judgment that asserts that the nonmoving party has no evidence by calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking all the record evidence allegedly supporting the nonmoving party that a party seeking summary judgment satisfies Rule 56's burden of production. Thus, if the record disclosed that the moving party had overlooked a witness who would provide relevant testimony for the nonmoving party at trial, the Court could not find that the moving party had discharged its initial burden of production unless the moving party sought to demonstrate the inadequacy of this witness' testimony. Absent such a demonstration, summary judgment would have to be denied on the ground that the moving party had failed to meet its burden of production under Rule 56.

477 U.S. at 331–33, 106 S.Ct. 2548 (Brennan, J., dissenting) (footnote and citations omitted) (emphasis added).

Justice Brennan explained that, "once the moving party has attacked whatever record evidence—if any—the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Id.* at 332, 106 S.Ct. 2548 n.3. According to Justice Brennan, "[s]ummary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." *Id.* After providing this explication of his view of the law, Justice Brennan declared that he did "not read the Court's opinion to say anything inconsistent with or different than the preceding discussion" and reiterated that his "disagreement with the Court concern[ed] the application of these principles to the facts" of the *Celotex* case. *Id.* at 334, 106 S.Ct. 2548.

### 3. *Byrd v. Hall*

Seven years after the *Celotex* trilogy, this Court set out in *Byrd* "to establish a clearer and more coherent summary judgment jurisprudence" under Tennessee Rule 56. 847 S.W.2d at 209. The *Byrd* Court stated, after examining prior Tennessee decisions and the *Celotex* trilogy, that "[c]omparison of the state and federal caselaw construing [Federal and Tennessee] Rule[s] 56 to date reveals no striking differences." *Id.* at 214. The Court observed that "[t]his similarity of construction is not remarkable since [Federal Rule] 56 served as the blueprint for our own [Tennessee] Rule 56, and the language of both rules is virtually identical." *Id.* The

*Byrd* Court described *Celotex* as standing for the "principle that a party may move for summary judgment demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for directed verdict." 847 S.W.2d at 213. And, the *Byrd* Court noted that the Sixth Circuit had "read *Celotex* to mean that 'the movant [can] challenge the opposing party to "put up or shut up" on a critical issue. After being afforded sufficient time for discovery ... if the [nonmoving party does] not "put up," summary judgment [is] proper.'" *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (alterations in original)). The *Byrd* Court then expressly "embrace[d] the construction of Rule 56 in *Anderson, Celotex,* and *Matsushita [Electric Industrial Company]* to the extent discussed in the prior section of this opinion relating to those cases." *Byrd*, 847 S.W.2d at 214.

Unfortunately, however, the *Byrd* Court followed up this pronouncement with several "observations" intended "to place a finer point on the proper use of the summary judgment process in this [S]tate." *Id.* As for the burdens of production placed on moving and nonmoving parties, the Court stated:

> [T]he party seeking summary judgment has the burden of demonstrating to the court that there are no disputed, material facts creating a genuine issue for trial, as we have defined those terms, and that he is entitled to judgment as a matter of law. A conclusory assertion that the nonmoving party has no evidence is clearly insufficient. When the party seeking summary judgment makes a properly supported motion, the burden then shifts to the nonmoving party to set forth specific facts, not legal conclusions, by using affidavits or the discovery materials listed in Rule 56.03, establishing that there are indeed disputed, material facts creating a genuine issue that needs to be resolved by the trier of fact and that a trial is therefore necessary. The nonmoving party may not rely upon the allegations or denials of his pleadings in carrying out this burden as mandated by Rule 56.05. The evidence offered by the nonmoving party must be taken as true. Moreover, the facts on which the non-movant relies must be admissible at the trial but need not be in admissible form as presented in the motion (otherwise an affidavit, for example, would be excluded as hearsay). To permit an opposition to be based on evidence that would not be admissible at trial would undermine the goal of the summary judgment process to prevent unnecessary trials since inadmissible evidence could not be used to support a jury verdict.

*Byrd*, 847 S.W.2d at 215–16 (footnotes omitted).

Although the *Byrd* Court stated that a moving party may satisfy "this required showing in several ways," it provided only two examples. *Id.* at 215 n.5. As the first example, the *Byrd* Court stated that a moving party may carry its burden by "affirmatively negat[ing]" an essential element of the nonmoving party's claim." *Id.* As for the second example, the Court stated that "the moving party could conclusively establish an affirmative defense that defeats the nonmoving party's claim, i.e., a defendant would be entitled to summary judgment if he demonstrated that the nonmoving party cannot establish an essential element of his case." *Id.* (citing *Celotex*, 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting)). The *Byrd* Court also turned to Justice Brennan's *Celotex* dissent for examples of how a nonmoving party may satisfy its burden when faced with a properly supported motion for summary judgment, explaining that in such circumstances a nonmoving party may: (1)

point to evidence overlooked or ignored by the moving party that establishes a material factual dispute; (2) rehabilitate evidence attacked in the moving party's papers; (3) produce additional evidence showing the existence of a genuine issue for trial; or (4) submit an affidavit explaining why further discovery is necessary as provided for in Tennessee Rule of Civil Procedure 56.06. *Id.* at 215 n.6.

### 4. The Confusion *Byrd* Engendered

Although *Byrd* quickly became Tennessee's summary judgment bible, "it also quickly drew criticism" and spawned confusion. Andrée Sophia Blumstein, *Bye, Bye Byrd?*, 45 Tenn. B.J. 23, 23 (Feb. 2009); *see also* June F. Entman, *Flawed Activism: The Tennessee Supreme Court's Advisory Opinions on Joint Tort Liability and Summary Judgment*, 24 Mem. St. U.L.Rev. 193, 216 (1994) [hereinafter *Flawed Activism*]. One commentator stated that although *Byrd* had "purport[ed] to adopt the federal standard for evaluating the movant's burden when the nonmovant bears the burden of proof on an issue, [*Byrd*] actually established a more rigorous standard for movants in Tennessee courts." Judy M. Cornett, *The Legacy of Byrd v. Hall: Gossiping about Summary Judgment in Tennessee*, 69 Tenn. L.Rev. 175, 175 (2001) [hereinafter *Gossiping about Summary Judgment*]. The confusion centered on "whether the party seeking summary judgment must *itself affirmatively negate* an essential element of the nonmovant's claim or whether it can just point to the nonmovant's failure to have come forward with evidence supporting its claim." *Bye, Bye Byrd?*, 45 Tenn. B.J. at 23. Those on one side of the debate interpreted *Byrd* as following the

*Celotex* trilogy and allowing a movant to satisfy its burden of production by demonstrating that the nonmovant's evidence was insufficient to establish an essential element of the nonmovant's claim. *See Denton v. Hahn*, No. M2003–00342–COA–R3–CV, 2004 WL 2083711, at *10–11 (Tenn. Ct. App. May 4, 2004) (Koch, J., majority opinion). This reading was based on the *Byrd* Court having embraced the interpretation of Federal Rule 56 in the *Celotex* trilogy and having quoted with apparent approval the Sixth Circuit's interpretation of *Celotex*. Andrée Sophia Blumstein, *Bye Bye Hannan?*, 47 Tenn. B.J. 14, 15 (Aug. 2011). Those on the other side of the debate read *Byrd*, particularly in light of subsequent summary judgment decisions of this Court,[5] as having adopted a standard dramatically different from the *Celotex* trilogy approach. *See Denton*, 2004 WL 2083711, at *14 (Tenn. Ct. App. May 4, 2004) (Cottrell, J., concurring); *Gossiping about Summary Judgment*, 69 Tenn. L.Rev. at 220 (stating that *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)"made real what was only incipient in *Byrd*: Tennessee's break with federal summary judgment jurisprudence"); *Bye, Bye Byrd?*, 45 Tenn. B.J. at 23. Under this interpretation of *Byrd*, a movant could not meet its burden simply by demonstrating that the nonmovant's evidence was insufficient at the summary judgment stage but was required to affirmatively negate an essential element of the nonmovant's claim or defense. *Bye, Bye Byrd?*, 45 Tenn. B.J. at 23. Additionally, the burden of production shifted to the nonmovant only if the movant satisfied this affirmative negation burden. *Id.* This reading of *Byrd* derived primarily from the fact that the *Byrd*

---

**5.** *See Blair v. West Town Mall*, 130 S.W.3d 761, 767 (Tenn. 2004); *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000);

*McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998).

Court discussed with approval the majority decision authored by Justice Rehnquist, as well as elements of Justice White's concurring opinion and Justice Brennan's dissenting opinion. *Gossiping About Summary Judgment,* 69 Tenn. L.Rev. at 180–93; *Flawed Activism,* 24 Mem. St. U.L.Rev. at 216–19. Proponents of this view pointed specifically to footnote five of *Byrd,* which provided the two examples from Justice Brennan's dissenting opinion of how a moving party may satisfy its burden of production. *Bye Bye Hannan?,* 47 Tenn. B.J. at 15.

### 5. *Hannan and its Aftermath*

We granted permission to appeal in *Hannan* to settle the debate and resolve the confusion about the proper interpretation of *Byrd. Hannan,* 270 S.W.3d at 1. After examining *Byrd, McCarley,* and other summary judgment decisions applying *Byrd,* the majority in *Hannan,* which included the undersigned, declared:

> These cases clearly show that a moving party's burden of production in Tennessee differs from the federal burden. It is not enough for the moving party to challenge the nonmoving party to "put up or shut up" or even to cast doubt on a party's ability to prove an element at trial.
>
> . . . . .
>
> In summary, in Tennessee, a moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial.

These are the two burden-shifting methods available to the moving party when the moving party does not bear the burden of proof at trial. The bur-den-shifting analysis differs, however, if the party bearing the burden at trial is the moving party. For example, a plaintiff who files a motion for partial summary judgment on an element of his or her claim shifts the burden by alleging undisputed facts that show the existence of that element and entitle the plaintiff to summary judgment as a matter of law. Similarly, a defendant asserting an affirmative defense, such as laches, shifts the burden of production by alleging undisputed facts that show the existence of the affirmative defense.

*Id.* at 8–9 & n.6 (emphasis added). Although the majority in *Hannan* acknowledged that no prior decision had explicitly rejected the *Celotex* standard, we explained that our "departure" from the federal standard actually began in *Byrd* and merely continued in *McCarley* and subsequent decisions. *Hannan,* 270 S.W.3d at 7 (citing *Blair,* 130 S.W.3d at 768; *Staples,* 15 S.W.3d at 88; *McCarley,* 960 S.W.2d at 588); *see also Hannan,* 270 S.W.3d at 7 n.4 (stating that at least one legal commentator had interpreted *Byrd* as departing from the *Celotex* standard and citing *Gossiping about Summary Judgment in Tennessee,* 69 Tenn. L.Rev. at 220). The *Hannan* majority did not, however, base its rejection of the *Celotex* standard on historical differences between federal and Tennessee summary judgment practice or textual differences between the state and federal versions of Rule 56. The *Hannan* majority also failed to acknowledge that only eight other states applied standards different from *Celotex.* Cornett's *Summary Judgment in Tennessee,* 77 Tenn. L.Rev. at 44 & nn. 266–273. Rather, the *Hannan* majority focused on settling the dispute over the proper interpretation of *Byrd. See* Cornett's *Summary Judgment in Tennessee,* 77 Tenn. L.Rev. at 337 ("The real tragedy of *Hannan* is . . . that

it addressed only the issue of what Tennessee law is, not what it should be. By making *Hannan* an interpretive battle over *Byrd*, the parties lost the opportunity to argue why *Celotex* would be a preferable summary judgment standard for Tennessee." (footnote omitted)).

Justice William C. Koch, Jr. dissented in *Hannan*. *Hannan*, 270 S.W.3d at 11 (Koch, J., dissenting). Justice Koch emphasized that Tennessee Rule 56 was patterned upon, and remained essentially identical to, Federal Rule 56. *Id.* at 12. Justice Koch noted as well that in the years after its adoption, this Court had interpreted Tennessee Rule 56 in a manner that "mirrored the federal courts' application of [Federal Rule 56]." *Id.* at 12–13. Justice Koch disagreed that *Byrd* departed from the federal standard, and he quoted the language of *Byrd* that purported to "embrace" the *Celotex* trilogy—including the portion of *Celotex* which permitted a moving party to satisfy its burden of production by demonstrating that the nonmoving party's evidence is insufficient at the summary judgment stage to establish an essential element of the nonmoving party's claim or defense. *Id.* at 16 (citing *Byrd*, 847 S.W.2d at 213, 215 n.5). Justice Koch predicted that *Hannan* would ultimately "undermine, rather than enhance, the utility of summary judgment proceedings as opportunities to weed out frivolous lawsuits and to avoid the time and expense of unnecessary trials." *Id.* at 12.

Justice Koch was not alone in his view that *Hannan* had significantly altered Tennessee summary judgment practice. According to one author, "most commentators believed that *Hannan* ha[d] driven a stake through the heart of summary judgment in Tennessee," and "[t]he predominant reaction to *Hannan* by the trial bench and the bar" was "trepidation." Cornett's *Summary Judgment in Tennessee*, 77 Tenn. L.Rev. at 306. Another commentator noted that by including the words "at trial" in the second example of how a movant may satisfy its burden of production, *Hannan* had shifted the burden of production away from the party who would bear the burden of proof at trial and "saddled" the defendant "with the burden of proof, a burden that requires the defendant to prove the negative of plaintiff's claim." *Bye, Bye Byrd?*, 45 Tenn. B.J. at 26. However, others, including the undersigned, viewed *Hannan* as merely reaffirming the summary judgment standards that had been applied since *Byrd*. *See* Cornett's *Summary Judgment in Tennessee*, 77 Tenn. L.Rev. at 332 (stating that in *Hannan* the majority had "stuck to its guns and reaffirmed the *Byrd–McCarley–Blair* standard").

Two years later it became clear that others in the *Hannan* majority viewed it as having fundamentally changed summary judgment practice when this Court, in a three-to-two decision, abandoned the burden-shifting mechanics set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for use at the summary judgment stage of employment discrimination and retaliation cases, as incompatible with the *Hannan* summary judgment standard. *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 785 (Tenn. 2010); *see also Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 801 (Tenn. 2010).[6] A year later, in 2011, the General Assembly enacted a statute

6. The undersigned, joined by Justice Koch, dissented in *Gossett* and *Kinsler* from the majority's decisions to abandon the *McDonnell Douglas* framework and argued that it was not incompatible with *Hannan*. *Gossett*, 320 S.W.3d at 789 (Clark, J., dissenting in part and concurring in the judgment); *Kinsler*, 320 S.W.3d at 802 (Clark, J., concurring in part and concurring in the judgment).

"with the stated purpose 'to overrule the summary judgment standard for parties who do not bear the burden of proof at trial set forth in *Hannan v. Alltel Publishing Co.*, its progeny, and the cases relied on in *Hannan.*'" *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 25 n.2 (Tenn. 2011) (quoting Act of May 20, 2011, ch. 498, § 2 Tenn. Pub. Acts 1471).[7]

### 6. Hannan Reconsidered

■ Having reexamined the *Celotex* trilogy, *Byrd*, and the majority and dissenting opinions in *Hannan*, as well as the cases that have followed it, we conclude that the standard adopted in *Hannan* is incompatible with the history and text of Tennessee Rule 56 and has functioned in practice to frustrate the purposes for which summary judgment was intended—a rapid and inexpensive means of resolving issues and cases about which there is no genuine issue regarding material facts. *Bowman*, 547 S.W.2d at 529; *Evco Corp.*, 528 S.W.2d at 24. Whether the standard began with *Byrd* or originated in *Hannan*, we conclude that the standard has shifted the balance too far and imposed on parties seeking summary judgment an almost insurmountable burden of production, as the Court of Appeals' decision in this case illustrates. *See also Boals v. Murphy*, No. W2013–00310–COA–R3–CV, 2013 WL 5872225, at *15 (Tenn. Ct. App. Oct. 30, 2013) (Kirby, J., author) (" 'Under *Hannan*, as we perceive the ruling in that case, it is not enough to rely on the nonmoving party's lack of proof even where, as here,

the trial court entered a scheduling order and ruled on the summary judgment motion after the deadline for discovery had passed. Under *Hannan*, we are required to assume that the nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim.' " (quoting *White v. Target Corp.*, No. W2010–02372–COA–R3–CV, 2012 WL 6599814, at *7 n.3 (Tenn. Ct. App. Dec. 18, 2012) (Kirby, J., author))).

Like Federal Rule 56, Tennessee Rule 56 does not require the moving party to present affidavits. Instead, it expressly dispenses with that requirement, stating that "a party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment" and "[a] party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought" may move for summary judgment "*with or without supporting affidavits.*" Tenn. R. Civ. P. 56.01, 56.02 (emphasis added); *see also* Tenn. R. Civ. P. 56.04 (directing the court to consider "affidavits, *if any*," in determining whether summary judgment should be granted (emphasis added)). Tennessee Rule 56 *requires* both the movant and the nonmovant to submit statements of undisputed facts, supported by citations to the record, "[i]n order to assist the Court in ascertaining whether there are any material facts in dispute," Tenn. R. Civ. P. 56.03, and provides that, "[s]ubject to the moving party's compliance with Rule 56.03, the judgment sought shall be rendered forth-

---

7. Tennessee Code Annotated section 20–16–101 provides as follows:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20–16–101 (Supp. 2014) (effective July 1, 2011). This statute does not apply in this appeal because the Ryes filed this action before the statute's July 1, 2011 effective date.

with if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, *if any*, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04 (emphasis added). Like Federal Rule 56, Tennessee Rule 56 clearly states that when a summary judgment motion is "supported as provided in [Tennessee Rule 56]," the nonmoving party "may not rest upon the mere allegations or denials of the [nonmoving] party's pleading," but in response, "by affidavits or as otherwise provided in [Tennessee Rule 56], must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Tenn. R. Civ. P. 56.06. Conspicuously absent from Tennessee Rule 56 is any language requiring the moving party to seek, obtain, and comply with a scheduling order before moving for summary judgment, although, according to the dissent, *Hannan* imposed this obligation.

Instead, like Federal Rule 56, Tennessee Rule 56 authorizes courts to order continuances on summary judgment motions to allow a party opposing summary judgment to obtain affidavits, take depositions, or engage in other forms of discovery as may be ordered. Tenn. R. Civ. P. 56.07. Because Tennessee Rule 56 provides trial courts with authority to grant continuances to nonmoving parties when summary judgment motions are made before adequate time for discovery has been provided, any differences between discovery in the federal system and discovery under the Tennessee Rules of Civil Procedure do not warrant rejection of the standards enunciated in the *Celotex* trilogy.

There is simply nothing in the history or text of Tennessee Rule 56 which necessitates rejecting the standards enunciated in the *Celotex* trilogy. Despite the dissent's assertions to the contrary, the principle in Tennessee law that cases should be decided on the merits does not require rejection of the *Celotex* trilogy. When a court determines, consistent with the standards in Tennessee Rule 56, that no genuine issue of material fact exists and grants summary judgment, the case *has been decided on the merits*.[8] For the same reason, adoption of the standards enunciated in the *Celotex* trilogy is entirely consistent with the constitutional right to trial by jury guaranteed by article I, section 6 of the Tennessee Constitution. As one commentator has put it, "under common law, a fact issue was the sine qua non of trial." Cornett's *Summary Judgment in Tennessee*, 77 Tenn. L.Rev. at 311. Tennessee courts have "always been empowered to decide legal questions upon agreed facts." *Id.* Tennessee Rule 56 "simply embodies the common law's recognition that if there is no factual dispute, there is no need for trial." *Id.*

We are mindful that the power of this Court to overrule former decisions "is very sparingly exercised and only when the reason is compelling." *Edingbourgh v. Sears, Roebuck & Co.*, 206 Tenn. 660, 337 S.W.2d 13, 14 (1960). Adhering to prior decisions is generally "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judi-

---

8. Indeed, although the dissent views *Hannan* as the better standard, by forcing parties to proceed to trial even when no genuine issues of material fact exist at the summary judgment stage, the *Hannan* standard actually is antithetical to the principle favoring "the just, speedy, and inexpensive determination" of actions on the merits. Tenn. R. Civ. P. 1.

cial process." *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing *Vasquez v. Hillery*, 474 U.S. 254, 265–66, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)); *see also In re Estate of McFarland*, 167 S.W.3d 299, 306 (Tenn. 2005). Simply stated, " 'in most matters it is more important that the applicable rule of law be settled than it be settled right.' " *Payne*, 501 U.S. at 827, 111 S.Ct. 2597 (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932)).

Nevertheless, "[o]ur oath is to do justice, not to perpetuate error." *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999) (quoting *Montgomery v. Stephan*, 359 Mich. 33, 101 N.W.2d 227, 229 (1960)). As a result, we are not constrained to follow "unworkable" or "badly reasoned" precedent. *Payne*, 501 U.S. at 827, 111 S.Ct. 2597 (citing *Smith v. Allwright*, 321 U.S. 649, 665, 64 S.Ct. 757, 88 L.Ed. 987 (1944)); *see also In re Estate of McFarland*, 167 S.W.3d at 306 (stating that "obvious error or unreasonableness in the precedent, changes in conditions which render the precedent obsolete, the likelihood that adherence to precedence would cause greater harm to the community than would disregarding stare decisis, or an inconsistency between precedent and a constitutional provision" justify overturning well-settled rules of law). Thus, "if an error has been committed, and becomes plain and palpable, th[is] [C]ourt will not decline to correct it, even though it may

have been reasserted and acquiesced in for a long number of years." *Arnold v. City of Knoxville*, 115 Tenn. 195, 90 S.W. 469, 470 (1905); *see, e.g., State v. Watkins*, 362 S.W.3d 530, 556 (Tenn. 2012) (overruling a sixteen-year-old decision because the state constitutional test it adopted was unworkable and because there was no textual or historical basis for interpreting the state constitutional provision as requiring a test distinct from the federal constitutional provision); *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 129–30 (Tenn. 2004) (overruling an eight-year-old decision that had adopted a minority rule and adopting instead the "better-reasoned" majority rule); *Jordan*, 984 S.W.2d at 600 (abrogating a ninety-six-year-old decision even though the statutory language it had interpreted remained the same).[9]

Indeed, we have "a special duty" to correct erroneous rules that have been "recognized and nurtured" by this Court. *Hanover v. Ruch*, 809 S.W.2d 893, 896 (Tenn. 1991) (abolishing the common law tort of criminal conversation for all cases filed prior to the effective date of a statute prospectively abolishing it); *see also Dupuis v. Hand*, 814 S.W.2d 340, 345 (Tenn. 1991) (abolishing the common law tort of alienation of affections for all cases filed prior to the effective date of a statute prospectively abolishing it). We would "abdicate our own function" were we to refuse to correct unworkable or erroneous

---

9. The Ryes' suggestion that any decision overruling *Hannan* and adopting the standards of the *Celotex* trilogy amounts to an impermissible retroactive application of Tennessee Code Annotated section 20–16–101, which violates article I, section 20 of the Tennessee Constitution, is simply incorrect. *See* Tenn. Cons. art. 1, § 20 ("[N]o retrospective law, or law impairing the obligations of contracts, shall be made."). That statute is irrelevant to this appeal. Thus, we are not retroactively applying the statute. Our decision overruling the manner in which *Hannan* interpreted Tennessee Rule 56 amounts instead to a proper exercise of our authority to reconsider, and when appropriate, abandon rules of law previously articulated in judicial decisions. In civil cases, judicial decisions overruling prior cases generally *are applied retrospectively*. *Hill v. City of Germantown*, 31 S.W.3d 234, 239 (Tenn. 2000).

court-made rules. *Hanover,* 809 S.W.2d at 896.[10]

Because the standard articulated in *Hannan* is unworkable and inconsistent with the history and text of Tennessee Rule 56, we take this opportunity to correct course, overrule *Hannan,* and fully embrace the standards articulated in the *Celotex* trilogy.[11]

### 7. Recap of Tennessee Summary Judgment Standards

Our overruling of *Hannan* means that in Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of produc-

tion either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each

---

10. The dissent either overlooks our obligation to correct erroneous court-made rules or fundamentally misunderstands it. By abandoning the *Hannan* standard, we are not, as the dissent asserts, "surrendering the constitutional authority of this Supreme Court to establish summary judgment standards for the judiciary." To the contrary, we are accepting responsibility for creating an unworkable standard and exercising our constitutional authority to correct the error and establish a workable summary judgment standard. The dissent's disagreement with our decision to abandon *Hannan* is understandable, as the dissenting justice, like the undersigned, joined the majority decision in *Hannan.* However, the dissent's suggestions that our decision somehow compromises judicial independence and disregards the doctrine of separation of powers are unfathomable and lack legal or factual foundation. By our decision in this appeal we cannot preempt a constitutional challenge to a statute that does not apply in this appeal. Our determination that the *Hannan* standard is unworkable is independent of and unrelated to legislative action. Furthermore, the fact that our decision comes after the Legislature has already enacted a statute aimed at changing the *Hannan* standard is not at all unusual. *See, e.g., Dupuis,* 814 S.W.2d at 345 (deciding to abolish a tort after it had already been prospectively abolished by the Legislature); *Hanover,* 809 S.W.2d at 896 (same). Indeed, over twenty years ago, we recognized that "it would be anomalous" for this Court to refuse to consider abolishing

common law torts in cases arising before statutes were enacted prospectively abolishing those same common law torts, and we noted that "the Legislature may not constitutionally preclude such consideration." *Hanover,* 809 S.W.2d at 896. These observations apply with equal force to the resolution of this appeal. Despite the dissent's doubts, we do not take lightly our oaths to uphold the United States and Tennessee Constitutions and understand fully the function and importance of the doctrine of separation of powers. Nevertheless, nothing requires us to maintain an unworkable court-made rule simply because another branch of government has arguably invaded the province of the judiciary.

11. We recognize that our decision to overrule *Hannan* calls into question the continued viability of *Gossett* and *Kinsler,* in which the majority rejected the *McDonnell Douglas* burden-shifting framework based on its incompatibility with *Hannan. See Williams v. City of Burns,* 465 S.W.3d 96, 112 n.15 (Tenn. 2015); *Sykes,* 343 S.W.3d at 26. Nevertheless, neither the continued viability of *Gossett* and *Kinsler,* nor the 2011 law amending Tennessee Code Annotated sections 4–21311, 50–1–304, and 50–1–701 as to "causes of action accruing on or after" its effective date of June 10, 2011, are at issue in this interlocutory appeal. *See* Act of June 10, 2011, ch. 461, 2011 Tenn. Pub. Acts 1227. We decline to address these questions unless and until they are presented in an appropriate case.

fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial. We turn our attention next to applying these standards in this appeal.

## C. Application of Summary Judgment Standards

### 1. Future Medical Expenses Arising from Mrs. Rye's Rh-sensitization

■ The Defendants argue that they are entitled to summary judgment because, even assuming Mrs. Rye's Rh-sensitization is considered a presently existing physical injury, the undisputed facts demonstrate that Mrs. Rye has not sustained any damages related to this injury and that no such damages are reasonably certain to occur.[12] We agree.

---

12. The dissent mischaracterizes our holding as concluding that Rh-sensitization does not under any circumstances qualify as a compensable injury and asserts that, in so holding, we are out of step with "several federal and state courts," which have recognized the cause of action. Actually, we are assuming for purposes of this appeal that Rh-sensitization may qualify as a compensable injury so long as damages are proven to a reasonable certainty. Furthermore, the dissent's assertion that "several federal and state courts" have recognized the viability of such a cause of action is questionable, at best, given that the assertion is supported by citations to a single state supreme court decision and three federal district court decisions. Some of these decisions are also factually distinct from this case. For example, in the Arizona Supreme Court decision, the lawsuit was brought after the Rh-sensitized mother's second child had been stillborn as a result of her undiscovered Rh-sensitization. *Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961, 963 (1984). One of the federal district court decisions involved beryllium sensitization, not Rh-sensitization. *Harris v. Brush Wellman Inc.*, No. CIVA1:04CV598HSORHW, 2007 WL 5960181, at *12 (S.D. Miss. Oct. 30, 2007). Another of the cited federal district court decisions involved a woman who sued *the manufacturer* of RhoGAM, alleging that the dosage she received was defective and failed to prevent her Rh-sensitization. *Alberg v. Ortho-Clinical Diagnostics, Inc.*, No. 98–CV–2006, 2000 WL 306701, at *1 (N.D.N.Y. Mar. 24, 2000). She alleged causes of action for negligence, *breach of warranty, and strict products*

 To prevail on a health care liability claim, a plaintiff must establish the following statutory elements:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29–26–115(a) (2012). A legal injury "signifies an act or omission against [a] person's rights that results in some damage." *Church v. Perales*, 39 S.W.3d 149, 171 (Tenn. Ct. App. 2000) (citing *Barnes v. Kyle*, 202 Tenn. 529, 306 S.W.2d 1, 4 (1957)). "Any want of skillful care or diligence on a physician's part that sets back a patient's recovery, prolongs the patient's illness, increases the plaintiff's suffering, or, in short, makes the patient's condition worse than if due skill, care, and diligence had been used, constitutes injury for the purpose of a [health

care liability action]." *Church*, 39 S.W.3d at 171.

In this case, the defense expert, Dr. Stovall, testified "within a reasonable degree of medical certainty that, while Mrs. Rye [has become] Rh-sensitized, she has incurred no physical injuries." The Ryes' expert, Dr. Bruner, stated that, "[b]iologically; [Mrs. Rye] is not the same person she was before she became Rh-sensitized" and "now possesses diseased blood" for life because of the Defendants' negligence. The facts are undisputed that Mrs. Rye's blood now contains antibodies that it would not have contained but for the Defendants' negligence.

Although the experts disagree as to whether the undisputed facts amount to a physical injury, this difference of opinion is not material. As noted above, a legal injury "signifies an act or omission against [a] person's rights that results in some damage." *Church*, 39 S.W.3d at 171. Thus, even assuming Mrs. Rye's Rh-sensitization amounts to a physical injury, the dispositive question is whether genuine issues of material fact exist as to the third factor: whether Mrs. Rye is reasonably certain to sustain damages for future medical expenses as a result of her Rh-sensitization.[13]

 After careful review, we answer this question in the negative. "The *existence* of damages cannot be uncertain,

---

liability, claiming that her fear of becoming pregnant after learning of her Rh-sensitization had caused emotional injuries. She produced enough evidence of emotional injury to survive summary judgment on these claims. *Id.* at *3. In *Harms v. Lab. Corp. of Am.*, 155 F.Supp.2d 891, 912 (N.D. Ill. 2001), the case most factually similar to this one, the court limited the Rh-sensitized woman's recovery "only to those injuries for which [the woman] herself [was] at risk" and disallowed recovery for the "risk of future injury to any future fetus," on the ground that "it is impossible to determine without speculation what sort of injury—if any—the fetus would suffer." *Id.*

Therefore *Harms* is not inconsistent with our holding in this appeal.

13. The Ryes did not request damages for past medical expenses in their complaint, although the memorandum of law the Ryes filed in the trial court mentioned that Mrs. Rye had been billed $343.00 for a medical evaluation/consultation with Dr. Michael Schneider. According to the Ryes' deposition testimony, Dr. Schneider met with them after Mrs. Rye's Rh-sensitization was discovered and explained the risks it posed for future pregnancies.

speculative, or remote." *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 (Tenn. 2012). "Damages may never be based on mere conjecture or speculation." *Overstreet v. Shoney's Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). "[T]o recover for [the] future effects of an injury, the future effects must be shown to be reasonably certain and not a mere likelihood or possibility and ... there must be a reasonable degree of medical certainty that the plaintiff will develop a disease in the future as a result of an injury." *Potts v. Celotex Corp.*, 796 S.W.2d 678, 681 (Tenn. 1990). As the Court of Appeals has more recently explained:

> A person who is injured by another's negligence may recover damages from the other person for all past, present, and prospective harm. Included in the prospective harm for which damages may be recovered is the reasonable cost of the medical services that will probably be incurred because of the lingering effects of the injuries caused by the negligent person. To remove awards for future medical expenses from the realm of speculation, persons seeking future medical expenses must present evidence (1) [showing] that additional medical treatment is reasonably certain to be required in the future and (2) [enabling] the trier-of-fact to reasonably estimate the cost of the expected treatment.
>
> The first component of a claim for future medical expenses is, in the language of the Tennessee Pattern Jury Instructions, evidence that additional medical treatment is "reasonably certain to be required in the future." This "reasonable certainty" standard requires more than a mere likelihood or possibility. It requires the plaintiff to establish with some degree of certainty that he or she will undergo future medical treatment for the injuries caused by the de-fendant's negligence. It does not, however, require proof of future medical treatment to an absolute or metaphysical certainty. Rather, the "reasonable certainty" standard requires the plaintiff to prove that he or she will, more probably than not, need these medical services in the future.

*Singh v. Larry Fowler Trucking, Inc.*, 390 S.W.3d 280, 287–88 (Tenn. Ct. App. 2012) (quoting *Henley v. Amacher*, No. M1999–02799–COA–R3–CV, 2002 WL 100402, at *13–14 (Tenn. Ct. App. Jan. 28, 2002)); *see also* 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Civil 14.50 (2014 ed.) ("If you are to determine a party's damages, you must compensate that party for loss or harm that is reasonably certain to be suffered in the future as a result of the injury in question. You may not include speculative damages, which is compensation for future loss or harm that, although possible, is conjectural or not reasonably certain.")

In his affidavit, Dr. Stovall opined that any future risks to Mrs. Rye as a result of a future pregnancy are "extremely remote" and that "it cannot be said with any reasonable degree of medical certainty that an Rh-sensitized patient will ever sustain any injuries or damages." In his deposition, Dr. Stovall reiterated his opinion that, unless Mrs. Rye becomes pregnant again, the Rh-sensitization presents no risk at all to her. Even if Mrs. Rye becomes pregnant in the future with an Rh-positive child, Dr. Stovall opined that there is only a 40% chance "she will develop enough antibodies that those antibodies will cross the placenta and cause the baby to have or to require the baby to have additional monitoring." Even if additional monitoring is required, however, Dr. Stovall opined that it is "more likely than not, like overwhelmingly—overwhelmingly, more likely than not, [that Mrs. Rye] would not have any complications."

Dr. Bruner opined that Mrs. Rye will, more likely than not, become pregnant again because the Ryes have declined to use birth control and because Mrs. Rye had previously become pregnant three times. Dr. Bruner further testified that should Mrs. Rye become pregnant in the future, there is a 70% chance the fetus will be Rh positive. Dr. Bruner additionally opined that an Rh positive fetus would, more likely than not, suffer moderate to severe complications due to Mrs. Rye's above-average Rh sensitization. Dr. Bruner also opined that, under such circumstances, the child would require aggressive treatment, and if left untreated, the child could suffer moderate to severe complications. According to Dr. Bruner, were Mrs. Rye's future unborn fetus to experience complications as a result of her Rh-sensitization, these complications, as well as the monitoring and treatment of them, would increase Mrs. Rye's health risks and the health risks to the unborn fetus.

Dr. Bruner also opined that Mrs. Rye will suffer future medical expenses and damages from her Rh-sensitization should she be involved in a future medical emergency involving an acute blood loss that requires an emergent blood transfusion. According to Dr. Bruner, these damages will be incurred because "[t]he presence of Rh antibodies in Mrs. Rye's blood will double or even triple the time necessary to identify compatible units of blood for transfusions" and "[t]his time difference is likely to be life threatening in an emergency situation in which blood transfusions are required."

Having reviewed the record, including the motion, response, affidavits and depositions, under the applicable summary judgment standards, we agree with the trial court that the Defendants are entitled to summary judgment on Mrs. Rye's claim for future medical expenses associated with future pregnancies and future blood transfusions. Mrs. Ryes' evidence is insufficient as a matter of law to demonstrate that future medical expenses are reasonably certain to occur and demonstrates instead that future medical expenses depend entirely upon contingencies that have not occurred and may never occur.

Although Dr. Bruner opined that Mrs. Rye is more likely than not to become pregnant again, his testimony referred only to Mrs. Rye's deposition testimony that she and Mr. Rye had engaged in unprotected sex since her Rh-sensitization and his understanding that Mrs. Rye had become pregnant three times before when the couple had engaged in sexual relations without using birth control. Mrs. Rye's deposition testimony actually includes a great deal of additional information that Dr. Bruner did not mention. Specifically, Mrs. Rye testified that prior to her Rh-sensitization the couple had not only declined to use birth control measures while engaging in unprotected sexual relations, they had planned to conceive children by determining when Mrs. Rye was "ovulating, things like that" and engaging in sexual relations during those times. Mrs. Rye stated that this planning had "worked" for them in conceiving children. After her Rh-sensitization, Mrs. Rye stated that the couple had used these same measures, along with the "rhythm" method, to prevent a fourth pregnancy. Mrs. Rye stated that the couple had abstained from sexual relations during times when Mrs. Rye "could be ovulating" and the likelihood of conception would have been greater. She also stated that the couple had "bought a bunch of tests" to assist them in determining when ovulation had occurred.[14] Mrs.

14. Mrs. Rye also testified that she had previously used birth control pills to treat certain

Rye, then thirty-nine-years-old, testified that she had not become pregnant during the four years between her January 2008 Rh-sensitization and her April 12, 2012 deposition.

Moreover, even if the first contingency occurs and Mrs. Rye becomes pregnant in the future, the medical experts agree that neither Mrs. Rye nor her unborn child will suffer any risks at all from her Rh-sensitization unless the unborn future child's blood is Rh positive. Thus, the undisputed facts establish that two contingencies must occur before Mrs. Rye's Rh-sensitization poses even a *risk* of damages to either Mrs. Rye or her future unborn children. The undisputed facts are thus insufficient to establish a genuine issue of material fact for trial as to the reasonable certainty of future medical expenses associated with future pregnancies.[15]

Mrs. Rye's proof also falls short of establishing a genuine issue of material fact for trial with regard to the reasonable certainty of damages for future medical expenses associated with future blood transfusions. At least three contingencies must occur before Mrs. Rye will ever incur damages of this sort. First, she must experience a future medical emergency involving an acute blood loss. Second, the medical emergency must have created an immediate need for a blood transfusion. Third, the blood typing required as a result of Mrs. Rye's Rh-sensitization must have caused delay that prevented Mrs. Rye from immediately receiving the needed blood transfusion. The Ryes have offered no proof at all that any of these future contingencies will ever occur.

Thus, the Ryes' request for future medical expenses arising from blood transfusions is based on possibilities and speculation, not reasonable certainty.

The record taken as a whole could not lead a rational trier of fact to find that the Ryes are reasonably certain to incur future medical expenses associated with Mrs. Rye's future pregnancies or blood transfusions. Thus, there is no genuine issue for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Because the Defendants have demonstrated, *after adequate time for discovery*, that Mrs. Rye lacks proof of an essential element of her claim and Mrs. Rye's response fails to identify proof supporting her claim, the Defendants are entitled to summary judgment. Accordingly, we reverse the Court of Appeals and reinstate the trial court's judgment granting the Defendants' summary judgment on Mrs. Rye's requests for damages for future medical expenses associated with future pregnancies and future potential blood transfusions.

### 2. The Ryes' NIED Claims

In *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996), this Court held that a plaintiff who asserts an NIED claim need not prove an accompanying physical injury. *Id.* at 446. Instead, we held that such claims should be analyzed under a "general negligence approach." *Id.* However, the *Camper* Court imposed safeguards designed not only to compensate persons who sustain serious emotional injuries but also to avoid compensating trivial and non-meritorious claims. *Id.* To these ends, a plaintiff bringing a stand-alone NIED

medical conditions, although she had not done so since her Rh-sensitization, and she also stated that the couple had used condoms previously for sanitary purposes and had done so within the year preceding her deposition.

**15.** We have not weighed the evidence, as the dissent contends. Rather, we have considered *all* of the undisputed facts in the record, unlike the dissent, which has harvested from the record only those facts supporting its favored result.

claim must prove that the emotional injury caused by the defendant's negligent conduct is "serious" or "severe." *Id.* And, "the claimed injury or impairment must be supported by expert medical or scientific proof." *Id.* Thus, *Camper* established that a plaintiff who brings a stand-alone NIED claim must (1) satisfy the five elements of ordinary negligence (duty, breach of duty, injury or loss, causation in fact, and proximate or legal cause), (2) establish a "serious" or "severe" emotional injury, and (3) prove that the emotional injury is serious or severe with expert medical or scientific proof. *Camper*, 915 S.W.2d at 446; *see also Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012).

In *Estate of Amos v. Vanderbilt Univ.*, 62 S.W.3d 133, 134 (Tenn. 2001), this Court considered whether the *Camper* requirement of expert medical or scientific evidence of a serious or severe injury extends to all negligence claims resulting in emotional injury. The *Estate of Amos* Court held that the *Camper* requirement applies only to stand-alone NIED claims and does not apply to cases in which the alleged emotional injury is "parasitic" to other types of claims or injuries. *Id.* at 137. The Court explained:

> The special proof requirements in *Camper* are a unique safeguard to ensure the reliability of "stand-alone" negligent infliction of emotional distress claims. The subjective nature of "stand-alone" emotional injuries creates a risk for fraudulent claims. The risk of a fraudulent claim is less, however, in a case in which a claim for emotional injury damages is one of multiple claims for damages. When emotional damages are a "parasitic" consequence of negligent conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements

that apply to "stand-alone" emotional distress claims.

*Id.* at 136–37.

More recently, in *Rogers*, this Court reaffirmed that the "expert proof" requirement applies only to "stand-alone" NIED claims and does not apply when a plaintiff's emotional injuries are "a 'parasitic' consequence of negligent conduct that results in multiple types of damages." *Rogers*, 367 S.W.3d at 206 n. 10. Nevertheless, we also stated that actions for "negligent infliction of emotional distress (including all three "subspecies" of negligent infliction: 'stand-alone,' 'parasitic,' and 'bystander') require an identical element: *a showing that the plaintiff suffered a serious mental injury resulting from the defendant's conduct.*" *Rogers*, 367 S.W.3d at 206 (emphasis added). A serious or severe mental injury occurs, we stated, if the plaintiff shows that "a reasonable person, normally constituted, would [have been] unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.* at 210. We explained that "[u]nable to cope with the mental stress engendered" requires a plaintiff to demonstrate, by way of six enumerated, non-exclusive factors or by other pertinent evidence, "that he or she has suffered significant impairment in his or her daily life." *Id.* The "nonexclusive factors" *Rogers* enumerated are as follows:

(1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;

(2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions

such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;

(3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically induced neurosis or psychosis, or phobia, and/or was prescribed medication;

(4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;

(5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and

(6) In certain instances, [evidence of] the extreme and outrageous character of the defendant's conduct. . . .

*Rogers*, 367. S.W.3d at 209–10. Having summarized the governing legal principles, we must evaluate whether genuine issues of material fact exist as to the Ryes' emotional distress claims.[16]

 We agree with the courts below that the undisputed facts establish that Mr. Rye has not suffered any physical injury. Although Mr. Rye argues that he has sustained an actual injury in the nature of a disruption of his family planning, we conclude, as will be explained more fully hereinafter, that Tennessee law does not recognize disruption of family planning as either an independent cause of action or an element of damages. Accordingly, Mr. Rye has alleged only a stand-alone NIED claim. We agree with the Defendants that summary judgment is appropriate because, despite having adequate time for discovery, and indeed despite expiration of all discovery deadlines, Mr. Rye has failed to submit any expert proof to establish a severe emotional injury—an essential element of his stand-alone NIED claim. Having demonstrated that Mr. Rye lacks proof of an essential element of his claim, the Defendants are entitled to summary judgment on this claim. Thus, we reverse the Court of Appeals' decision and reinstate the judgment of the trial court granting summary judgment on this issue.

 We agree with the courts below that Mrs. Rye's claim for emotional distress damages is "parasitic" to her health care liability claim. However, we agree with the Defendants that summary judgment on this claim is appropriate because, although expert proof is not required, Mrs. Rye has offered no proof at all to demonstrate that she has suffered a severe or serious mental injury. Mrs. Rye testified in her deposition that she was "scared" and "so upset" when told of the risks her Rh-sensitization could pose to any future pregnancy, that she remains "very concerned" about the risks that could arise should she need a blood transfusion or become pregnant in the future. Mrs. Rye testified that she thinks about the risks associated with her Rh-sensitization "every day" and that she is more careful in her sexual relations with her husband because of the risks that could arise should she become pregnant in the future. However, Mrs. Rye stated that she has not sought emotional or psychiatric counseling or mental health treatment from a psychiatrist, a psychologist, a counselor, or anyone else as a result of her concerns. Mrs. Rye also testified that her concerns have not caused her to lose any time from work or business activities and that she has continued her parenting responsibilities without disruption.

---

**16.** The dissent's conclusion that a genuine issue of material fact exists is flawed because the dissent fails to apply correctly the factors articulated in *Rogers*.

Although we are not without sympathy for Mrs. Rye, considering the legal standards articulated in *Rogers*, we conclude that Mrs. Rye's testimony is clearly insufficient to create a genuine issue of material fact concerning the essential element of severe or serious mental injury. Despite adequate time for discovery, Mrs. Rye provided no evidence of a serious mental injury resulting from the Defendants' conduct. She has neither suffered physiological or psychological symptoms, nor sought medical or professional treatment, nor incurred any significant impairment in her daily functioning resulting from her Rh-sensitization. In fact, she testified that she has not sought any counseling or treatment of any sort and that her daily work and parenting routines have not been disrupted. Having demonstrated that Mrs. Rye's evidence is insufficient to create a genuine issue of material fact for trial, the Defendants are entitled to summary judgment on Mrs. Rye's parasitic claim for emotional distress damages.

### 3. The Ryes' Claims for Disruption of Family Planning

■ The Ryes argue that the courts below erred in granting summary judgment on their claims for disruption of family planning. The Ryes assert that this Court should hold, based on *Davis v. Davis*, 842 S.W.2d 588, 600–601 (Tenn. 1992), that Tennessee law recognizes disruption of family planning as either an independent cause of action or as an element of damages for other negligence based claims. We agree with the Defendants that neither *Davis* nor any other Tennessee decision recognizes disruption of family planning as an independent cause of action or an element of damages.

Indeed, *Davis* is entirely distinguishable on its facts from this case. *Davis* began as a divorce action. *Davis*, 842 S.W.2d at 589. The divorcing couple could not agree as to the disposition of the cryogenically preserved product of their in vitro fertilization, which the *Davis* Court referred to as "frozen embryos." *Id.* Mrs. Davis originally sought custody of the frozen embryos and expressed her intent to use them to become pregnant once the divorce was final, but Mr. Davis objected to becoming a parent after the divorce and without his consent. *Id.* The trial court determined that the frozen embryos were "human beings" and awarded Mrs. Davis custody of them. *Id.* The Court of Appeals reversed and remanded to the trial court for entry of an order vesting Mr. and Mrs. Davis with "joint control ... and equal voice over their disposition." *Id.* This Court granted review, adopted a balancing test to determine which potential parent should receive control of the frozen embryos, and after applying the balancing test, affirmed the Court of Appeals. *Id.* at 590, 598–602.

It is true that, in devising the balancing test, the *Davis* Court referenced decisions of the United States Supreme Court discussing (1) the individual constitutional right to "be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"; (2) procreational autonomy; (3) and parental rights and responsibilities regarding children. *Id.* at 598–602. However, the *Davis* Court neither held, nor implied, nor even suggested that Tennessee law recognizes disruption of family planning as either an independent action or an element of damages in negligence cases. Accordingly, we affirm the decisions of the courts below granting the Defendants summary judgment on the Ryes' claim for disruption of family planning as an independent action. Having already concluded, on a separate basis, that summary judgment is appropriate on Mrs. Rye's parasitic claim for

emotional distress damages, we need not address the trial court's ruling allowing Mrs. Rye to present evidence of disruption of the Ryes' family planning as proof of her parasitic emotional distress damages claim. As we have already concluded, however, *Davis* provides no support for the trial court's ruling.

## IV. Conclusion

Having overruled *Hannan* and adopted and applied the summary judgment standards articulated in the *Celotex* trilogy and in Tennessee Rule 56, we conclude that the Defendants are entitled to summary judgment on all claims the Ryes raised in this appeal. Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand this case to the trial court for entry of summary judgment on these claims and any further necessary proceedings consistent with this decision. Costs of this appeal are taxed to the Ryes, for which execution may issue if necessary.

Jeffrey S. Bivins, J., concurring.

I concur in all respects with the excellent opinion in this case authored by Justice Clark. I write separately solely to address from a somewhat different perspective some of the points raised by the dissent. The dissent claims that *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1 (Tenn. 2008) simply "refined" the summary judgment standard adopted by this Court dating back to 1993 in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993). Based in part upon my first-hand experiences in the trenches as a trial court judge, I beg to differ.

The *Hannan* opinion was filed on Friday, October 31, 2008. At that point in time, I was serving as a trial court judge in the 21st Judicial District. Prior to *Hannan*, the great majority of trial court judges interpreted *Byrd* to be consistent with the federal standard. Thus, upon review of *Hannan*, it became immediately apparent that, rather than representing a "refinement" of *Byrd*, *Hannan* represented a sea change in summary judgment jurisprudence in this State. Indeed, these ramifications manifested themselves merely three days later on my civil motions docket on Monday, Nov. 3, 2008. That docket contained five motions for summary judgment. As a result of *Hannan*, I granted one motion and denied the other four motions. Had I applied the *Byrd* standard, at least as interpreted by most trial court judges at that time, I would have granted summary judgment in two of the four cases in which I denied the motion. Indeed, the one case in which I did grant summary judgment was a case that was submitted on stipulated facts.

Moreover, to the extent that there was any remaining flicker in the flame of hope that *Hannan* merely represented a "refinement" of *Byrd*, this Court extinguished that flicker with the force of an open hydrant in its decisions two years later in the cases of *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010), and *Kinsler v. Berkline, LLC*, 320 S.W.3d 796 (Tenn. 2010). As the majority opinion points out, in *Gossett* and Kinsler, the Court abandoned the long-standing burden-shifting procedure set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) that had been applied at the summary judgment stage in employment discrimination and retaliation cases. The Court specifically held that "the McDonnell Douglas framework is inapplicable at the summary judgment stage *because it is incompatible with Tennessee summary judgment jurisprudence.*" *Gossett*, 320 S.W.3d at 785 (emphasis added). Thus, *Gossett* and *Kinsler* fully confirmed that *Hannan*, indeed, constituted a radical

departure from prior summary judgment jurisprudence.

The dissent also contends that *Hannan* is not unworkable because we "have produced [no] data whatsoever indicating a significant decrease in the percentage of summary judgments granted after *Hannan*." Of course there is no such data because that information is not collected at the trial court level. Additionally, any attempt to compile such data from a review of appellate decisions is not helpful. Appeals from denials of motions for summary judgment are extremely rare and can only be accomplished by interlocutory appeals under Rule 9 or Rule 10 of the Tennessee Rules of Appellate Procedure. Thus, any such data derived from appellate court opinions is meaningless in measuring the impact of *Hannan*.

Finally, I must state that the dissent's separation of powers argument is rather baffling, at best. If those of us joining in the majority opinion in this case intended to "surrender[ ] the constitutional authority of this Supreme Court," would not it have been much easier to avoid this case and simply affirm the constitutionality of Tennessee Code Annotated section 20–16–101 in an ultimate constitutional challenge to that statutory provision? Instead, to the contrary, we have chosen to stake out our constitutional duty to interpret our rules irrespective of the legislature's action. Indeed, rather than the federal standard adopted today "appear[ing] to be entirely consistent with section 20–16–101" as stated by the dissent, we may yet face a challenge to this constitutionally-suspect statute because of the specific language of that provision to determine if the two approaches are consistent.

Sharon G. Lee, C.J., concurring.

I was not serving on the Supreme Court in 2008 when *Hannan v. Alltel Publishing*

*Co.*, 270 S.W.3d 1 (Tenn. 2008) was argued. Had I participated in the *Hannan* decision, I would have joined in the majority opinion. However, after observing the application of the unique *Hannan* standard over the past seven years, I conclude that the *Hannan* standard is unworkable and should be replaced. Although it is often easier to maintain the status quo rather than admit that a mistake was made, we do not have this option. We must change course when we realize we are headed in the wrong direction.

The dissent recognizes that *Hannan* "did not clearly articulate with precision just how the second prong was intended to work in practice" and suggests that it be clarified. This is an implicit acknowledgement that the *Hannan* standard is unworkable. As a proposed "clarification" of *Hannan*, the dissent suggests that trial courts should rely more extensively on scheduling orders. The dissent does not explain how a grant of summary judgment based on the passage of a discovery cutoff date would square with a core holding in *Hannan*—that it is "not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial and that it will not suffice for the moving party to simply show that the nonmoving party 'lacks evidence to prove an essential element of its claim.'" *Hannan*, 270 S.W.3d at 8. The problem is, under *Hannan*, absent an affirmative defense such as a statute of limitations, the moving party may not obtain summary judgment before trial, even if the nonmoving party has *no evidence whatsoever* to support the claims in the complaint. This problem cannot be "clarified" away. The only fix is to scrap it and replace it with a workable standard.

The dissent suggests that we should keep the *Hannan* standard so that we can,

in a future case, "confront head-on the separation of powers issue" presented by the enactment of Tennessee Code Annotated section 20–16–101. I am unwilling to saddle litigants with a summary judgment standard that is unworkable simply to set the stage for a showdown with the Legislature over its authority to enact a summary judgment standard. The dissent references this as a "game of chicken" between the General Assembly and the Tennessee Supreme Court. I call it fulfilling my oath of office and maintaining the independence and integrity of the judiciary.

Gary R. Wade, J., concurring in part and dissenting in part.

The majority opinion accurately recounts the development of this area of the law but ultimately concludes that the summary judgment standard first articulated in *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), and later refined in *Hannan v. Alltel Publishing Co.*, 270 S.W.3d 1 (Tenn. 2008), and other decisions of this Court, must now be overruled. In my view, the principles articulated in *Hannan*, when interpreted in light of the history of summary judgment in Tennessee, set forth the preferable standard for shifting the burden of proof at summary judgment—one that is fully consistent with Tennessee Rule of Civil Procedure 56. By granting Rule 11 review in a case which pre-dated the passage of a statute purporting to set a new standard for summary judgment, by rejecting the well-established doctrine of stare decisis, and by acquiescing to the standard proposed by the General Assembly, my colleagues have preempted the future consideration of an important constitutional issue—whether the General Assembly, by its enactment of Tennessee

Code Annotated section 20–16–101 (Supp. 2014), has violated the separation-of-powers doctrine.[1] In the interest of consistent, predictable procedural guidelines of adjudication, I would hold that *Byrd, Hannan,* and their progeny should be reaffirmed as the standard for summary judgment in Tennessee and should be applied to the facts before us. Moreover, in my assessment, even the federal standard, as adopted in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), does not warrant dismissal on all of the claims. I must, therefore, respectfully dissent.

## I. Summary Judgment in Tennessee

The summary judgment standard articulated by this Court in Hannan has been accurately summarized as follows:

When a motion for summary judgment is made, the moving party has the burden of showing that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party may accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) **showing that the non-moving party will not be able to prove an essential element at trial. However, it is not enough for the moving party to challenge the non-moving party to put up or shut up? or even to cast doubt on a party's ability to prove an element at trial.** If the moving party's motion is properly supported, the burden of production then shifts to the non-moving party to show that a genuine issue of material fact exists. The non-moving party may accomplish this by: (1) point-

---

1. More to the point, I would not have granted the Defendants permission to appeal in the first place. Because section 20–16–101 does not apply to the Ryes' claim, the Court of Appeals applied the correct standard for summary judgment, and neither of the parties raised on appeal the continued vitality or wisdom of the *Byrd/Hannan* standard.

ing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery. . . .

*Rye v. Women's Care Ctr. of Memphis, MPLLC,* No. W2013–00804–COA–R9–CV, 2014 WL 903142, at *5 (Tenn. Ct. App. Mar. 10, 2014) (emphasis added) (alterations, citations, and internal quotation marks omitted). These principles of summary judgment have a long-standing foundation in Tennessee jurisprudence, as confirmed in 1993 with this Court's ruling in *Byrd,* as reaffirmed in 1998 by *McCarley v. West Quality Food Service,* 960 S.W.2d 585 (Tenn. 1998), and as refined in 2008 by our decision in Hannan, as well as other more recent cases.[2] Today, less than seven years after the Hannan decision and more than twenty years since *Byrd,* my colleagues have reversed field, observing that our summary judgment standard is "incompatible with the history and text of Tennessee Rule [of Civil Procedure] 56" and "frustrate[s] the purposes for which summary judgment was intended." The majority opinion suggests that by adding the words "at trial" to the second prong of the *Byrd/Hannan* standard, the Court improperly moved the focus away from the evidence adduced at the summary judgment stage and onto "hypothetical evidence that theoretically could be adduced, **despite the passage of discovery dead-** **lines,** at a future trial." (Emphasis added.) Ultimately, the majority has concluded that the *Byrd/Hannan* standard "has shifted the balance too far and imposed on parties seeking summary judgment an almost insurmountable burden of production." I disagree on all counts.

In my view, the majority opinion is based upon an erroneous premise—a faulty interpretation of Hannan that appears to have originated in an unpublished decision by our Court of Appeals, in which there was no application for permission to appeal to this Court. In *White v. Target Corp.,* the Western Section of the Court of Appeals criticized by footnote the Hannan ruling, speculating that the standard requires trial courts to assume future hypothetical facts at the summary judgment stage. No. W2010–02372–COA–R3–CV, 2012 WL 6599814, at *7 n.3 (Tenn. Ct. App. Dec. 18, 2012). The footnote, which failed to include any authority supportive of its interpretation, provides as follows:

> Under *Hannan,* as we perceive the ruling in that case, it is not enough to rely on the nonmoving party's lack of proof **even where, as here, the trial court entered a scheduling order and ruled on the summary judgment motion after the deadline for discovery had. passed.** Under *Hannan,* we are required to assume that the nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim.

*Id.* (emphasis added); *see also Boals v. Murphy,* No. W2013–00310–COA–R3–CV, 2013 WL 5872225, at *5 (Tenn. Ct. App. Oct. 30, 2013). Until now, this Court has

---

**2.** Contrary to the majority's assertion, Hannan did not "fundamentally change[ ] summary judgment practice." In *Byrd,* this Court "reaffirm[ed] the summary judgment principles found in . . . Tennessee cases[,] . . . embrace[d] the construction of Rule 56 in [the *Celotex* line of federal cases] to [some] extent," and made several "observations to place a finer point on the proper use of the summary judgment process in this state." *Byrd,* 847 S.W.2d at 214. While Hannan later served to clarify *Byrd's* use of the term "affirmative defense," the standard otherwise remained unchanged. *See Hannan,* 270 S.W.3d at 6–7.

never endorsed the correctness of the *Target* footnote.[3] In my view, the better course would have been to simply reject the interpretation advanced by the *Target* footnote, reaffirm the *Byrd/Hannan* standard, and capitalize upon this opportunity to clarify the rationale for the differences between Tennessee and federal summary judgment jurisprudence.[4]

Even if it is true, as the majority concludes, that "nothing in the history or text of Tennessee Rule [of Civil Procedure] 56 ... **necessitates rejecting** the [federal] standard[ ]" for summary judgment, neither does anything in the history or text of our Rule 56 **require adopting** the federal standard. (Emphasis added.)[5] We have consistently rejected federal rules that are contrary to "the strong preference embodied in the Tennessee Rules of Civil Procedure that cases ... be decided on their merits," and have afforded appropriate

recognition to "the Tennessee constitutional mandate that 'the right of trial by jury shall remain inviolate.'" *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 432 (Tenn. 2011) (quoting Tenn. Const. art. I, § 6) (citing *Jones v. Prof'l Motorcycle Escort Serv., L.L.C.,* 193 S.W.3d 564, 572 (Tenn. 2006)); *cf. State v. Bennett,* No. 01C01–9607–CC–00139, 1998 WL 909487, at *11 (Tenn. Crim. App. Dec. 31, 1998) (Wade, J., concurring) ("Because the right to trial by jury is too precious to abridge, ... I would tend to trust a well-informed jury, which has seen and heard firsthand of the quantity and quality of the evidence, rather than an impartial tribunal of judges exposed only to the written record of the trial.... I am unwilling to denigrate the importance of the right to a jury of peers[;] ... [t]hat is too great a sacrifice....").[6] As stated, this Court first rejected the federal standard in *Byrd*

3. Since that footnote was written, this interpretation of *Hannan* has been cited by seventeen Court of Appeals opinions, including *Rye*, all of which are unpublished. In eleven of those cases, neither party sought permission to appeal to this Court. *See* Tenn. R. App. P. 11. In one of those cases, a Rule 11 application was filed but the appeal was withdrawn and dismissed before this Court reviewed it. In another, a Rule 11 application was filed but the *Target* court's interpretation of *Hannan* was not raised as an issue on appeal. Finally, three of the cases have Rule 11 applications pending our decision in this case.

4. In fact, at oral argument before this Court, counsel for the Defendants conceded that the *Target* footnote was an erroneous interpretation of Hannan and that the Court would not need to overrule Hannan in order to render a judgment in favor of the Defendants.

5. Contrary to the assertion by the majority, I do not mean to imply that Tennessee law **requires** the rejection of the federal *Celotex* standard. The fact remains, however, that we have consistently applied our own summary judgment standard for the last twenty-two years, and the majority has not articulated any principled reason to suddenly abandon

that practice now in favor of the federal standard.

6. While I recognize that civil cases may be technically decided "on the merits" before going to trial, such as where there are no material facts in dispute and the issues can be resolved by a trial judge as a matter of law, the Tennessee Constitution and the Tennessee Rules of Civil Procedure clearly favor the right to trial by jury and, therefore, fully support the adoption of a summary judgment standard which places a heavier burden on parties who "want out of [a] lawsuit on the merits short of a trial." Judy M. Cornett, *Trick or Treat? Summary Judgment in Tennessee After Hannan v. Alltel Publishing Co.,* 77 Tenn. L.Rev. 305, 343–44 (2010) [hereinafter Cornett, 77 Tenn. L.Rev.]; *see also id.* at 338 ("Tennessee has traditionally favored merits-based determinations over efficiency. As we have seen, even in its limited precursors to summary judgment, Tennessee jurisprudence was highly skeptical of deciding any issue on the papers alone."); *id.* at 349 ("Tennessee's long-standing tradition of preferring merits-based determinations to efficiency considerations would probably loom large in the [Supreme C]ourt's reasoning [for rejecting the

and continued to do so in numerous cases thereafter. *See* Cornett, 77 Tenn. L.Rev. at 317 ( [I]n the almost fifteen years between *Byrd* and the trial court's decision in *Hannan,* the Tennessee Court of Appeals generally interpreted *Byrd* correctly as rejecting the [federal] " 'put up or shut up' " standard.).[7] In *Hannan,* we confirmed that "we began our departure from the federal standard" in *Byrd,* explaining the distinction between the two interpretations as follows:

Th[e] second method of shifting the burden of production outlined in the *Byrd* opinion ... differs significantly from [the federal standard's] second method of burden-shifting. The opinion in *Byrd* requires a moving party to demonstrate that the nonmoving party **cannot establish** an essential element of the claim at trial. [The federal standard], however, would give the moving party the easier burden of demonstrating that the nonmoving party's **evidence**—at the summary judgment stage—is **insufficient** to establish an essential element. Therefore, the standard we adopted in *Byrd* clearly differs from [the federal] standard and poses a heavier burden for the moving party.

*Hannan,* 270 S.W.3d at 7 (citations omitted). Importantly, the emphasis of the Court in *Hannan* was not on the difference between the phrases "at trial," as

---

federal standard]. Given Tennessee's strong constitutionally based right to trial by jury in civil cases, the [Supreme C]ourt might also be concerned not to adopt a procedure that would encroach on the province of the jury.").

7. In the twenty-two years since *Byrd* was decided, that decision has been cited with approval in over 100 opinions by this Court, many of which were joined or authored by a majority of the current members of this Court. Since Hannan was decided in October of 2008, a majority of our current members has approved of the summary judgment standard in over twenty of our own opinions. *See Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.,* 395 S.W.3d 653 (Tenn. 2013); *Himmelfarb v. Allain,* 380 S.W.3d 35 (Tenn. 2012); *Perkins v. Metro. Gov't of Nashville & Davidson Cnty.,* 380 S.W.3d 73 (Tenn. 2012); *Fed. Ins. Co. v. Winters,* 354 S.W.3d 287 (Tenn. 2011); *Starr v. Hill,* 353 S.W.3d 478 (Tenn. 2011); *Kiser v. Wolfe,* 353 S.W.3d 741 (Tenn. 2011); *Kiser,* 353 S.W.3d at 750 (Lee, J., concurring in part & dissenting in part); *Shipley v. Williams,* 350 S.W.3d 527 (Tenn. 2011); *Sykes v. Chattanooga Hous. Auth.,* 343 S.W.3d 18 (Tenn. 2011); *Estate of French v. Stratford House,* 333 S.W.3d 546 (Tenn. 2011); *Sherrill v. Souder,* 325 S.W.3d 584 (Tenn. 2010); *Davis v. McGuigan,* 325 S.W.3d 149 (Tenn. 2010); *Davis,* 325 S.W.3d at 167 (Koch, J., dissenting); *Shelby Cnty. Health Care Corp. v. Nationwide Mut. Ins. Co.,* 325 S.W.3d 88 (Tenn. 2010); *Gossett v. Tractor Supply Co.,* 320 S.W.3d 777 (Tenn.2010); *Gossett,* 320 S.W.3d at 789 (Clark, J., concurring in part & dissenting in part); *Kinsler v. Berkline, LLC,* 320 S.W.3d 796 (Tenn. 2010); *Kinsler,* 320 S.W.3d at 802 (Clark, J., concurring in part & concurring in the judgment); *Cox v. M.A. Primary & Urgent Care Clinic,* 313 S.W.3d 240 (Tenn. 2010); *In re Estate of Davis,* 308 S.W.3d 832 (Tenn. 2010); *Home Builders Ass'n of Middle Tenn. v. Williamson Cnty.,* 304 S.W.3d 812 (Tenn. 2010); *Mills v. CSX Transp., Inc.,* 300 S.W.3d 627 (Tenn. 2009); *Stanfill v. Mountain,* 301 S.W.3d 179 (Tenn. 2009); *Giggers v. Memphis Hous. Auth.,* 277 S.W.3d 359 (Tenn. 2009); *Martin v. Norfolk S. Ry.,* 271 S.W.3d 76 (Tenn. 2008).

The U.S. Supreme Court has explained the importance of adherence to precedent:
Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. Adhering to precedent "is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than it be settled right." *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting).
*Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citation omitted).

used in the Tennessee standard, and "at the summary judgment stage," as used in the federal standard. Instead, the *Hannan* Court embraced the concept of adjudication on the merits, pointing out that in Tennessee the moving party cannot shift the burden to the non-moving party by merely asserting that the non-moving party "**lacks evidence** to prove an essential element of its claim." *See id.* at 8 (emphasis added).

One law review article has offered the following explanation:

> Clearly, in articulating th[e] [second method for] shifting the burden to the nonmovant, **the Tennessee Supreme Court rejected the federal approach to summary judgment as a way of testing the sufficiency of the nonmovant's evidence pre-trial. In Tennessee, the movant has to produce negative evidence or has to somehow show that, at the time of trial, the nonmovant will be unable to prove an essential element of the claim.** It is utterly insufficient in Tennessee for a movant to merely allege that the plaintiffs' evidence **at that stage** is insufficient to prove an essential element of its case.

Cornett, 77 Tenn. L.Rev. at 334 (emphasis added) (footnotes omitted). As suggested by several commentators, the second prong of *Hannan* requires the moving party to do more than point to omissions in the non-moving party's proof or cast doubt on the non-moving party's evidence; instead, the moving party must affirmatively

"show [at the summary judgment stage] that something is **impossible** [at trial]." *Id.* at 334 n.198 (emphasis added). One of our esteemed trial judges "has suggested [to moving parties] that this alternative could be satisfied by showing that the pretrial order prohibits presentation of certain evidence at trial, usually because evidence was obtained too late." *Id.* (citing Notes by Judy Cornett from presentation by Chancellor Daryl Fansler, Knox County Chancery Court, *Hannan v. Alltel—Is Summary Judgment Dead?*, Continuing Legal Education program at East Tennessee Lawyers Association for Women, Knoxville, Tennessee (Sept. 16, 2009) (on file with the Tennessee Law Review)); *accord McDaniel v. Rustom*, No. W2008–00674–COA–R3–CV, 2009 WL 1211335, at *13–15 (Tenn. Ct. App. May 5, 2009). Commentators have agreed that the second prong of *Hannan* encourages defendants in civil cases to "strive for greater use of pretrial orders with firm cut-off dates for completion of discovery and exchange of evidence." Cornett, 77 Tenn. L.Rev. at 334 n.198.[8] In my view, this interpretation of the *Byrd/Hannan* standard fully comports with Tennessee Rule of Civil Procedure 56—on the one hand providing the opportunity for a summary dismissal of a baseless claim, and, on the other, protecting the right to a jury trial on the merits when there are material facts in dispute.[9]

Finally, *Hannan* should not have been read to require courts "to assume that the

---

**8.** Proceeding under the second prong may require a moving party to delay the filing of a motion for summary judgment until discovery has been completed or the discovery deadlines have passed, unlike instances in which a moving party is able to file a motion for summary judgment earlier in the proceedings by affirmatively negating an essential element of the claim; nevertheless, the burden can easily be shifted under the second prong of

*Hannan* by the use of strict discovery deadlines.

**9.** The majority criticizes this interpretation of the *Byrd/Hannan* standard, observing that "[c]onspicuously absent from Tennessee Rule [of Civil Procedure] 56 is any language requiring the moving party to seek, obtain, and comply with a scheduling order before moving for summary judgment, although, according to the dissent, *Hannan* imposed this obligation." In my assessment, this statement by

nonmoving party may still, by the time of trial, somehow come up with evidence to support her claim." *Target Corp.*, 2012 WL 6599814, at *7 n.3. Otherwise, literally every summary judgment motion would be denied under the second prong of *Hannan*. Of course, that has not been the case since the *Hannan* ruling. Summary judgment continues to be regularly granted in favor of the party which does not bear the burden of proof at trial. The case before us illustrates that very point. The trial court and our Court of Appeals applied the *Byrd/Hannan* standard and yet still granted partial summary judgment to the Defendants.[10]

## II. Application of the *Byrd/Hannan* Standard in this Case

On February 24, 2009, Mr. and Mrs. Rye filed a health care liability action against the Defendants, alleging various injuries as a result of the Defendants' failure to administer a timely RhoGAM injection to Mrs. Rye during the third trimester of her third pregnancy. In a health care liability action, a plaintiff is required to prove each of the following elements:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the

---

the majority is both misleading and irrelevant. First, the use of scheduling, planning, and pre-trial orders is already governed by Tennessee Rule of Civil Procedure 16, so there would be no need for Rule 56 to reiterate these procedures. Second, I have not suggested that *Hannan* "imposed" a scheduling order "obligation." Our summary judgment standard allows the moving party to shift the burden by demonstrating that, for whatever reason, the non-moving party "will not be able to prove an essential element at trial." *Rye*, 2014 WL 903142, at *5. Failure to comply with a scheduling order is simply one way to meet this standard. Third, while I recognize that our opinion in *Hannan* did not clearly articulate with precision just how the second prong was intended to work in practice, the nature of the common law is development on a case-by-case basis. It is not at all unusual for one decision to leave room for later interpretation. Just as this Court used the *Hannan* decision to clarify the term "affirmative defense" from *Byrd*, I would take this opportunity to clarify the application of the second prong of *Hannan*.

10. I do not take lightly "our obligation to correct erroneous court-made rules," if the

circumstances are appropriate to do so. *See, e.g., State v. Collier*, 411 S.W.3d 886, 899–900 (Tenn. 2013) (Wade, C.J.) (overruling more than twenty years of common law which embraced the minority rule that the victim of a statutory rape qualifies as an accomplice to the crime). It is well established, however, that the principle of stare decisis dictates that we only change the law when absolutely necessary. In my view, the summary judgment standard in Tennessee does not require correction, except to the extent that it has been misinterpreted by the unfortunate footnote in *Target*. Moreover, aside from the purely anecdotal account of Justice Bivins covering a day in his tenure as a trial judge, neither the majority opinion nor the separate opinions have produced any data whatsoever indicating a significant decrease in the percentage of summary judgments granted after *Hannan*. In consequence, my colleagues have failed to substantiate their assertion that the Tennessee summary judgment standard has proved to be "unworkable." Simply put, any confusion as to the application of the *Hannan* standard is the result of a fundamental misunderstanding of that decision—a misunderstanding now perpetuated, rather than corrected, by the majority.

plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29–26–115(a) (2012).[11] In this instance, the first two elements are present. As to the third element, it is undisputed that the Defendants' negligence in failing to administer a timely RhoGAM injection resulted in Mrs. Rye's becoming Rh-sensitized, which is an irreversible condition that affects the antibodies present in Mrs. Rye's blood.[12] The only issue is whether the Ryes have suffered or will suffer injury "which would not otherwise have occurred." Tenn. Code Ann. § 29–26–115(a)(3). In support of their claims, the Ryes classified their injuries as follows: (1) physical injuries to Mrs. Rye, "including disruption of the normal functioning of [Mrs. Rye's] capability to conceive unimpaired, healthy children, free from an abnormally high risk of birth defects or premature fetal death"; (2) disruption of family planning; (3) infliction of emotional distress upon Mrs. Rye; (4) infliction of emotional distress upon Mr. Rye; (5) future medical expenses likely to be incurred by Mrs. Rye for any future pregnancies; and (6) future medical expenses likely to be incurred by Mrs. Rye for any future blood transfusions.

On March 10, 2011, the trial court entered a scheduling order pursuant to Tennessee Rule of Civil Procedure 16. As is relevant to this appeal, the scheduling order required the Ryes to disclose their expert witnesses by May 1, 2011; all discovery depositions were to be completed by September 1, 2011; dispositive motions were to be filed by December 1, 2011; and trial was scheduled for February 6, 2012. On July 15, 2011, prior to the completion of discovery, the trial court held a hearing on the Defendants' motion to dismiss or, in the alternative, for summary judgment. At that time, the trial court was provided with the depositions of the Ryes and the Defendants, as well as competing affidavits from expert witnesses to support each side. On August 10, 2011, the trial court entered a written order granting the Defendants a partial summary judgment; in particular, the trial court granted the Defendants' motion as to "all claims for future damages for injuries to [Mrs.] Rye that relate to prospective injury relating to blood transfusions or future pregnancies."

On January 24, 2012, almost four months after the discovery deadlines had passed, the Defendants renewed their request for summary judgment on the Ryes' remaining claims for damages. On the morning of the trial, the trial court granted partial summary judgment for the Defendants as to Mr. Rye's stand-alone claim for negligent infliction of emotional distress and as to the Ryes' stand-alone claim for disruption of family planning. The trial was postponed. In an order entered

**11.** At the time the Ryes filed their complaint, "health care liability" actions were still referred to as "medical malpractice" actions. In 2012, section 29–26–115(a), along with numerous other sections in the Code, was amended to replace the term "malpractice" with "health care liability." See Act of Apr. 23, 2012, ch. 798, § 7, 2012–2 Tenn.Code Ann. Adv. Legis. Serv. 274, 274 (LexisNexis). The substantive elements of the statute remained unchanged.

**12.** If an individual with Rh-negative blood becomes sensitized to Rh-positive blood, this individual will develop antibodies to Rh-positive blood. The exposure to Rh-positive blood in an Rh-negative woman most commonly occurs during blood transfusions and pregnancies. If an Rh-sensitized woman becomes pregnant with an Rh-positive fetus, the antibodies in the woman's Rh-negative blood will attack and destroy the fetus' red blood cells. Dr. Linda Burke–Galloway, *RhoGAM Shot During Pregnancy*, Pregnancy Corner, http://www.pregnancycorner.com/being-pregnant/healthnutrition/rhogam.html (last updated June 2014).

several months later, the trial court ruled that the Ryes could proceed to trial on only two disputed issues of material fact: (1) whether Mrs. Rye had sustained a compensable physical injury as a result of the Defendants' failure to administer a timely RhoGAM injection, and (2) whether Mrs. Rye had suffered emotional distress as a result of the Defendants' conduct. The trial court also ruled that the Ryes would be allowed to present evidence of the disruption of their family planning as an element of damages related to Mrs. Rye's claim of emotional distress.

On interlocutory appeal, the Court of Appeals, Western Section, reversed in part and affirmed in part. *Rye*, 2014 WL 903142, at *1. Specifically, the Court of Appeals affirmed the trial court's grant of summary judgment to the Defendants on the Ryes' stand-alone claim for disruption of family planning and Mrs. Rye's claim for future medical expenses associated with any future blood transfusions, but reversed the trial court's grant of summary judgment on Mrs. Rye's claim for future medical expenses associated with any future pregnancies. *Id.* at *9, *16. Further, applying the literal interpretation of "at trial" as expressed in the *Target* footnote and despite the fact that discovery had come to an end, the Court of Appeals reversed the grant of summary judgment for the Defendants on Mr. Rye's stand-alone claim for emotional distress, a determination which was based on the theory that he might be able to produce supportive expert testimony by the time of trial. *Id.* at *23–24. The effect of the ruling was that the Ryes could proceed to trial on four disputed issues: (1) whether Mrs. Rye had sustained a compensable physical injury as a result of the Defendants' failure to administer a timely Rho-GAM injection; (2) whether Mrs. Rye had suffered emotional distress as a result of the Defendants' conduct; (3) whether Mr.

Rye had suffered emotional distress as a result of the Defendants' conduct; and (4) whether Mrs. Rye was entitled to future medical expenses related to any future pregnancies. *Id.* at *1, *24.

Pursuant to the *Celotex* federal standard for burden-shifting at the summary judgment stage, my colleagues have concluded that the Defendants are entitled to summary judgment on each of the Ryes' claims. In my view, however, application of either the *Byrd/Hannan* standard or the federal standard would warrant summary judgment on only three of the six injuries alleged in the original complaint: (1) disruption of family planning as a stand-alone claim; (2) Mr. Rye's stand-alone claim for emotional distress; and (3) Mrs. Rye's future medical expenses related to future blood transfusions. I believe that there exist genuine issues of material fact as to the three remaining claims, all of which should proceed to a trial on the merits: (1) whether Mrs. Rye's condition of Rh-sensitization has caused her harm in the form of a present physical injury; (2) whether Mrs. Rye's Rh-sensitization has caused her harm in the form of emotional distress; and (3) whether Mrs. Rye's Rh-sensitization is reasonably certain to cause her prospective harm related to future pregnancies.

## A. Rh–Sensitization as a Present Physical Injury

Although several federal and state courts have already recognized the viability of such a claim, the question of whether Rh-sensitization qualifies as a compensable injury is a matter of first impression in Tennessee. The record in this case includes conflicting affidavits and deposition testimony from medical experts as to whether Mrs. Rye has suffered a compensable physical injury in the form of Rh-sensitization, irrespective of any future

medical expenses related to future pregnancies or blood transfusions. My colleagues, however, have narrowed the scope of this issue to the hypothetical, determining that "even [if] Mrs. Rye's Rh-sensitization amounts to a physical injury, the dispositive question is ... whether Mrs. Rye is reasonably certain to sustain damages for future medical expenses as a result of her Rh-sensitization."[13] Focusing only upon future medical expenses and prospective harm to Mrs. Rye, the majority answers this question in the negative and, therefore, grants summary judgment. I cannot agree. In my view, this Court, as federal courts and the courts of other states have done, should recognize the cause of action, and a jury should be permitted to resolve the disputed issue of whether Mrs. Rye has a compensable physical injury as a result of her altered blood status and decreased ability to bear children without serious medical complications—an irreversible condition from which Mrs. Rye would not suffer but for the failure of the Defendants to administer a timely RhoGAM injection.

Other jurisdictions have already considered whether this condition qualifies as an injury justifying the recovery of physical damages. In *Kenyon v. Hammer*, for example, Sharon Kenyon filed a medical malpractice action against a physician who had failed to administer a necessary RhoGAM injection after the birth of her first child in 1972. 142 Ariz. 69, 688 P.2d 961, 963 (1984). After the trial court granted summary judgment for the physician, Mrs. Kenyon argued on appeal that her injury did not arise—and, therefore, did not trigger the applicable statute of limitations—until the conception of her second child, who "was stillborn [in 1978] as a result of the destruction of its blood cells by [Mrs. Kenyon's] Rh antibodies." *Id.* at 963–64, 967. The Arizona Supreme Court recognized the cause of action but held that Mrs. Kenyon had sustained her injury in 1972 and, therefore, her claim was barred by the statute of limitations:

> **When her doctor failed to administer RhoGAM within seventy-two hours of the birth of her first child, Mrs. Kenyon's physical condition changed for the worse because her ability to bear other children was significantly impaired.** She became more susceptible to just those problems which later occurred in the case at bench. If the [defendant] had realized the error four days after the birth of the first child ..., he would have been bound to advise Mrs. Kenyon of the error and to have warned her of the risk of future pregnancy. Greater susceptibility to physical harm has been recognized as an element of damage in Arizona. **Certainly, if Mrs. Kenyon had known of her condition and consulted counsel shortly after the birth of her first child, an action could have been brought to recover damages for the decreased ability to bear children or increased risk of fetal fatality. That decreased ability or increased susceptibility is damage which will sustain a cause of action in tort.**

---

13. The majority insists that it has not foreclosed the possibility of a claim based on Rh-sensitization as a present physical injury, under certain circumstances, because it is "assuming for purposes of this appeal that Rh-sensitization may qualify as a compensable injury so long as damages are proven to a reasonable certainty." Nowhere in the majority's analysis, however, is there a discussion of **presently existing damages** in the form of an altered bodily status or a decreased ability to bear children. Instead, the majority focuses solely on "whether Mrs. Rye is reasonably certain to sustain damages for **future medical expenses** as a result of her Rh-sensitization." (Emphasis added.)

*Id.* at 967 (emphasis added) (citations omitted); *see also DeStories v. City of Phoenix,* 154 Ariz. 604, 744 P.2d 705, 709 (Ariz. Ct. App. 1987) ("Mrs. Kenyon's 'greater susceptibility' was an identifiable, fully developed, present medical condition."). Likewise, in *Harms v. Laboratory Corp. of America,* the plaintiff's Rh-sensitization injury was described as follows:

> [Ms.] Harms suffers from Rh sensitization. Whether this condition causes her actual physical pain and suffering, [she] **has been permanently altered by this sensitization. . . . Thus, the court disagrees with Labcorp's characterization that [she] has not suffered a present physical injury. . . .** While injuries to a fetus—or emotional injuries suffered by [Ms.] Harms as a result of those injuries to a fetus—may not be recoverable at this time, the court finds that [Ms.] **Harms may still be entitled to recovery on injury—either physical or emotional—to herself.**

155 F.Supp.2d 891, 910 (N.D. Ill. 2001) (emphasis added); *see also Harris v. Brush Wellman Inc.,* No. 1:04cv598HSO-RHW, 2007 WL 5960181, at *12 (S.D. Miss. Oct. 30, 2007) (citing the holding in *Harms* that a "plaintiff suffering from Rh sensitization . . . has an actual injury regardless of the absence of current physical symptoms"); *Alberg v. Ortho–Clinical Diagnostics, Inc.,* No. 98–CV–2006, 2000 WL 306701, at *3 (N.D.N.Y. Mar. 24, 2000) (describing Rh-sensitization as an irreversible, undesired change in a person's physiology that "was designed to be prevented by RhoGam").[14]

In this instance, Mrs. Rye now suffers from Rh-sensitization as a result of the Defendants' negligent failure to administer a timely RhoGAM injection. Although the Defendants contend that Rh-sensitization is not a compensable injury, the Ryes have properly asserted this condition as a present physical injury in the form of an altered bodily status, despite the lack of current physical symptoms. The Ryes further contend that impairment to a woman's childbearing capability should be a recognized element of damages. As indicated, other jurisdictions have acknowledged the cause of action advanced by the Ryes and have recognized Rh-sensitization as a physical injury, entitling a claimant to recover for both physical and emotional damages if a claim is filed within the statute of limitations. In this instance, both the trial court and Court of Appeals recognized the viability of this claim. I agree. In my view, summary judgment for the Defendants is inappropriate pursuant to either the Celotex/federal standard or the *Byrd/Hannan* standard.

### B. Emotional Distress of Mrs. Rye

Because Mrs. Rye has alleged that she suffers from emotional distress as a "parasitic" consequence of her Rh-sensitization, she has not presented a stand-alone claim for negligent infliction of emotional distress and, under our law, is not required to prove the existence of emotional damages through expert medical testimony. *See Estate of Amos v. Vanderbilt Univ.,* 62 S.W.3d 133, 136–37 (Tenn. 2001). Nevertheless, in order to succeed on this theory of damages, she must establish that she has "suffered a serious mental injury resulting from the [Defendants'] conduct."

14. The factual differences in these cases, as pointed out by the majority in an attempt to undermine their applicability to the Ryes' circumstances, are completely irrelevant to the legal conclusion reached by each of these jurisdictions—that Rh-sensitization is an existing physical injury in and of itself, which gives rise to a cause of action at the time a physician fails to administer the necessary RhoGAM injection, irrespective of (although not exclusive to) any future harm that may be caused to the mother or the fetus.

*Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012). Our case law suggests that she may do so by presenting evidence of "unpleasant mental reactions such as ... anger, chagrin, disappointment, and worry," along with "[e]vidence regarding the duration and intensity" of these symptoms, or by presenting "[o]ther evidence that the [Defendants'] conduct caused [her] to suffer significant impairment in ... her daily functioning." *Id.* at 209–10.[15] Contrary to the assertion by the majority, such evidence may be established by the Ryes' own testimony and does not require proof that Mrs. Rye "sought emotional or psychiatric counseling or mental health treatment from a psychiatrist, a psychologist, a counselor, or anyone else." *Cf. id.* at 210; *see also Miller v. Willbanks*, 8 S.W.3d 607, 615 (Tenn. 1999).[16]

The deposition testimony of Mr. and Mrs. Rye fully supports the existence of Mrs. Rye's damages in the form of emotional distress and, in consequence, this issue should survive summary judgment, whether under the *Byrd/Hannan* standard or that adopted for the federal courts in *Celotex*. Mrs. Rye testified that immediately upon learning of her sensitized condition, which was clearly caused by the Defendants' conduct, she was simply "scared ... to death." She described her painful reaction when one of her daughters, who had overheard the conversation with Mrs. Rye's physician, informed her grandmother that "mommy can't have any more babies or they'll die." Throughout her deposition, Mrs. Rye repeatedly described the level of her "concern" and "anxiety" upon learning of the serious risks to herself and her future children. She contended that she and her husband worry about the effects of Rh-sensitization "every single day," a condition that has affected her ability to have more children, as both she and her husband had planned throughout their marriage. As practicing Catholics, the Ryes cannot use any form of birth control for contraceptive purposes; in consequence, they must refrain altogether from sexual relations during ovulation because of the risks involved. Mrs. Rye described her relationship with her husband as "completely different" now that she is Rh-sensitized. She attested to daily anxiety, spelling out in some detail their concerns in the context of their religious beliefs, and their meetings with their priest. All of this evidence establishes a factual basis for an award of damages based on Mrs. Rye's emotional distress.

Under the *Byrd/Hannan* standard for summary judgment, the Defendants have failed to either negate Mrs. Rye's claim of emotional distress or otherwise establish that Mrs. Rye will be unable to prove her damages. Moreover, even by the federal standard, the Ryes' testimony creates a genuine issue of material fact as to whether Mrs. Rye suffered compensable emotional distress. *See Rogers*, 367 S.W.3d at 209–10. Her Rh-sensitization has adversely affected her fundamental right to bear and raise children. *See Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (describing "the deci-

15. Other "nonexclusive factors" that may be considered in a claim for emotional distress include "[e]vidence of physiological manifestations of emotional distress" and "[e]vidence that the [claimant] sought medical treatment, was diagnosed with a medical or psychiatric disorder ..., and/or was prescribed medication." *Id.* at 210. "In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury." *Id.*

16. Even if this were a requirement for proving an emotional distress claim, the Ryes both testified that they had sought advice and counseling from their priest, who surely would qualify as "anyone else" providing support services.

sion whether to bear or beget a child" as "fundamental"); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the [human] race."). None of the Ryes' concerns would exist but for the failure of the Defendants to have administered a routine RhoGAM injection during Mrs. Rye's third pregnancy. Under either summary judgment standard, the evidence must be viewed in a light most favorable to the claims of the non-moving party, with all reasonable inferences drawn in favor of those claims. *Celotex Corp.,* 477 U.S. at 330–31 & n.2, 106 S.Ct. 2548 (Brennan, J., dissenting); *Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000). In my view, a reasonable juror could easily conclude that Mrs. Rye has suffered genuine and profound emotional distress. By granting summary judgment, however, my colleagues have precluded any consideration of the merits of this claim.

## C. Future Medical Expenses Related to Future Pregnancies

In Tennessee, a claimant may recover damages for future medical expenses related to a present injury if "the future effects [are] shown to be reasonably certain and not a mere likelihood or possibility." *Potts v. Celotex Corp.,* 796 S.W.2d 678, 681 (Tenn. 1990). This means that "before a [claimant] may recover for potential injuries, there must be a reasonable degree of medical certainty that the [claimant] will develop a disease in the future as a result of an injury." *Id.* The terms "reasonably certain" and "reasonable degree of medical certainty" "require[ ] the [claimant] to prove that he or she will, **more probably than not**, need … medical services in the future." *Singh v. Larry Fowler Trucking, Inc.,* 390 S.W.3d 280, 287 (Tenn. Ct. App. 2012) (emphasis added) (quoting *Henley v.*

*Amacher,* No. M1999–02799–COA–R3–CV, 2002 WL 100402, at *13–14 (Tenn. Ct. App. Jan. 28, 2002)). While the **amount** of future damages is necessarily "speculative and imprecise" to some degree, "this imprecision is not grounds for excluding" evidence of the **existence** of future medical expenses that may be incurred. *Overstreet v. Shoney's, Inc.,* 4 S.W.3d 694, 704 (Tenn. Ct. App. 1999).

In this instance, the Defendants have supported their motion for summary judgment with the affidavit and deposition of their expert witness, Dr. Thomas G. Stovall, who testified "within a reasonable degree of medical certainty that it is more likely than not that an Rh-sensitized individual will never sustain any injuries or damages whatsoever." Dr. Stovall further testified that "[t]he risks of any future injuries to [Mrs. Rye] or to a child in a future pregnancy, if such a child is conceived, are so remote that it cannot be stated with any reasonable degree of medical certainty that such injuries would in fact occur." In response, the Ryes submitted the affidavit and deposition of their expert witness, Dr. Joseph Bruner, who testified that "[c]ontrary to the opinions of Dr. Stovall, it is my opinion that it is more probable than not that unborn children of Mr. and Mrs. Rye will experience complications," including the "severe consequences" of Rh-sensitization such as a ruptured liver or spleen, excessive bleeding, permanent brain damage, anemia, heart problems, and even fetal death. According to Dr. Bruner, if the child of an Rh-sensitized mother survives the pregnancy, it can develop "deafness, speech problems, cerebral palsy, or mental retardation." Dr. Bruner further testified that "it is more probable than not that Mrs. Rye's next pregnancy will involve a baby with moderate to severe disease in utero." More specifically, Dr. Bruner explained

that "[w]ith [Mrs. Rye's] next R[h] incompatible pregnancy, ... she **will** produce antibodies that **will** cross the placenta, and they **will** attach to the fetal red blood cells. And these red blood cells **will** be destroyed, and the fetus **will** experience some degree of anemia." (Emphasis added.) Finally, when asked by defense counsel during the deposition if he could "say that any of these things ... are more likely than not going to occur to [Mrs. Rye] in the future," Dr. Bruner responded as follows:

> [Dr. Bruner:] It's more likely than not that she will become pregnant with another sensitized pregnancy.
>
> ....
>
> [Defense counsel:] And ... more likely than not, it's going to be a child whose blood is not compatible with [Mrs. Rye's] R[h-sensitized] status. You're saying that's more likely than not, more than a 50 percent chance of that?
>
> [Dr. Bruner:] That's correct.
>
> ....
>
> So more likely than not, she will become pregnant again.... More likely than not, the fetus will be affected in at least one or more future pregnancies.... Over all, there's a 70 percent chance her pregnancy will be affected.
>
> ....
>
> It's more likely than not that she will become pregnant again. If she becomes pregnant again, based on what we know today, there's a 70 percent risk that the baby will be incompatible. It's more likely than not that baby will have moderate to severe disease and require invasive procedures.

....

Okay. So it's more likely than not, she'll become pregnant. It's more likely than not, the baby will be incompatible. It's more likely than not, the disease will be moderate to severe....

My colleagues conclude that the Defendants are entitled to summary judgment on this issue because Mrs. Rye's "future medical expenses depend entirely upon contingencies that have not occurred and may never occur." Again, this is not the standard for the review of evidence at the summary judgment stage. *See Staples*, 15 S.W.3d at 89 ("[At the summary judgment stage,] [c]ourts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor."). Our case law requires only that the claimant introduce expert testimony that future damages will "more probably than not" occur. *Singh*, 390 S.W.3d at 287. Because the Ryes have expert proof that Mrs. Rye's Rh-sensitization is more likely than not to result in future medical expenses, the Defendants have neither affirmatively negated an element of the Ryes' claim nor otherwise demonstrated that Mrs. Rye will be unable to prove future damages at trial.[17] Even under the federal standard for summary judgment, the Defendants have not shown that the Ryes' evidence is insufficient to prove the existence of future harm to Mrs. Rye during any future pregnancies.

As stated, the jurisdictions recognizing a claim based on Rh-sensitization agree that the injury accrues at the time a RhoGAM injection should have been administered,

17. Contrary to the assertion by the majority, I have not "harvested from the record only those facts supporting [my] favored result." A thorough review of the deposition testimony and affidavits by the competing medical experts, when properly viewed in the light most favorable to the Ryes, leads to only one plausible conclusion—the Defendants have not disproven the opinion of Mrs. Rye's expert that she is more likely than not, as a result of her Rh-sensitized condition, to incur medical expenses related to a future pregnancy.

even when the amount of future damages is uncertain. *See Dahl v. St. John's Hosp.*, No. 89–1784, 1990 WL 96045, at *4 & n.3 (Wis. Ct. App. Apr. 24, 1990) (holding that the plaintiff's injury and cause of action accrued at the time of the defendant's alleged "failure to administer a RhoGAM injection within approximately three days of the first child's birth[, which] began the process of Rh factor sensitization that impaired [the plaintiff's] ability to have healthy children in the future"); *accord Ford v. Guaranty Nat'l Ins. Co.*, No. 1:93CV213–S–D, 1997 WL 786767, at *6 (N.D. Miss. Nov. 26, 1997); *Kenyon*, 688 P.2d at 967; *Simmons v. Riverside Methodist Hosp.*, 44 Ohio App.2d 146, 336 N.E.2d 460, 461, 464 (1975). Because an Rh-sensitized claimant who fails to file suit until a future pregnancy actually causes complications would likely be barred by the statute of limitations, these other jurisdictions have recognized that the suit must be filed as soon as the claimant learns that the medical provider failed to administer the necessary RhoGAM injection. *See, e.g., Dahl*, 1990 WL 96045, at *4–5 (recognizing that despite "the inequity and potentially significant social effects of a decision that requires litigation of claims before the ultimate damage is known," the plaintiff's "claim ... existed ... when the RhoGAM was not administered," and "[a] claim for damages for future complications is recognized at law if the jury can adequately assess the probability of future damages"). This Court should follow the lead of the other states and recognize the viability of this claim. If Mrs. Rye does become pregnant in the future and suffers the very complications Dr. Bruner has identified as more than likely to occur, those responsible for her injury will escape accountability by virtue of our one-year statute of limitations in health care liability actions. Under these circumstances, I cannot agree that summary judgment is appropriate on this issue.

## D. Future Medical Expenses Related to Future Blood Transfusions

Unlike Mrs. Rye's claim for medical expenses related to future pregnancies, the existence of future expenses related to any future blood transfusions is too remote and uncertain to survive summary judgment. In support of their motion for summary judgment, the Defendants offered the affidavit of their expert witness, Dr. Stovall, who opined "within a reasonable degree of medical certainty that it is more likely than not that an Rh-sensitized individual will never sustain any injuries or damages whatsoever." In response, the Ryes offered the affidavit and deposition testimony of their expert, Dr. Bruner, who stated only that Mrs. Rye was at an "increased risk of life-threatening problems" if she were to be involved in some "medical emergency" that would "require[ ] an urgent or emergent blood transfusion as a life-saving procedure." Testimony by Dr. Bruner that Mrs. Rye's condition "is likely to be life threatening in an emergency situation in which blood transfusions are required" does not establish the degree of probability required to support a claim for future damages. *See Singh*, 390 S.W.3d at 287. In fact, Dr. Bruner conceded that he could not testify that Mrs. Rye would more probably than not require a blood transfusion in the future. Thus, the Defendants have affirmatively negated the Ryes' claim that future medical expenses related to blood transfusions are reasonably certain to occur, and the Ryes have been unable to respond with any evidence establishing the existence of a genuine issue for trial. I agree, therefore, that summary judgment, under either the *Byrd/Hannan* standard or the *Celotex* federal standard, should be

granted in favor of the Defendants on this issue.

### E. Emotional Distress of Mr. Rye

Initially, I agree with the assessment by my colleagues and the Court of Appeals that "[t]he trial court properly concluded that Mr. Rye's claim for negligent infliction of emotional distress is a 'stand alone' claim, requiring expert proof to prevail at trial." *Rye*, 2014 WL 903142, at *24; *see Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996). Recognizing that Mr. Rye has failed to identify any expert who would testify at trial that he has suffered a severe emotional injury, the majority concludes that summary judgment for the Defendants is appropriate because "Mr. Rye lacks proof of an essential element of his claim." As indicated, the Court of Appeals reversed the trial court's grant of summary judgment on this issue, relying solely upon the interpretation of Hannan as expressed in the *Target* footnote. *Rye*, 2014 WL 903142, at *23–24; *see also Boals*, 2013 WL 5872225, at *5. In my view, even under the *Byrd/Hannan* standard, the Defendants are entitled to summary judgment because they have affirmatively demonstrated that Mr. Rye will be unable to prove his emotional distress claim at trial. This issue presents the perfect opportunity to clarify how the second prong of Hannan should work in practice.

Applying an interpretation of *Hannan* as expressed by the Court of Appeals and the majority of this Court, summary judgment is not appropriate even where, as here, a claimant has failed to identify a requisite expert witness within the established discovery deadlines. In my view, however, the phrase "at trial," as used in *Hannan*, was never intended to relieve claimants from the responsibility to comply with discovery deadlines. In this instance, the Defendants did well to obtain a sched-uling order from the trial court which established "firm cut-off dates for completion of discovery and exchange of evidence." Cornett, 77 Tenn. L.Rev. at 334 n.198. Expert proof is required to support a stand-alone claim for emotional distress, but Mr. Rye failed to identify, within the discovery deadlines set by the trial court, an expert witness who could corroborate the viability of his claim. In consequence, the Defendants have satisfied the second prong of the Hannan standard by showing at the summary judgment stage, after the discovery deadlines, that Mr. Rye cannot prove his claim at trial. *See id.; see also McDaniel*, 2009 WL 1211335, at *13–15 (explaining that the defendant was entitled to summary judgment because the plaintiffs had failed to identify a qualified expert witness within the time established by the trial court's scheduling order). Thus, while I would apply the standard articulated in *Byrd, Hannan*, and their progeny, rather than the newly adopted federal standard, I agree with the majority that on this issue, summary judgment should be granted in favor of the Defendants.

### F. Disruption of Family Planning

Finally, I agree with the majority that Tennessee does not recognize a stand-alone claim for "disruption of family planning." *See Rye*, 2014 WL 903142, at *13–16. As both the trial court and Court of Appeals correctly concluded, however, the Ryes should be allowed to present evidence of the disruption of their family plans as a part of the physical and emotional damages associated with Mrs. Rye's Rh-sensitization. As stated, the Ryes have alleged physical injuries in the form of Mrs. Rye's altered blood status and the "disruption of the normal functioning of [her] capability to conceive unimpaired, healthy children, free from an abnormally high risk of birth defects or premature fetal death." They have also alleged emo-

tional injuries in the form of Mrs. Rye's daily concerns and anxiety about the significant impairment of her ability to engage in regular sexual activity with her husband or to conceive more children. As indicated, courts in other jurisdictions have recognized these theories of recovery for claimants who have become Rh-sensitized due to the negligence of a medical provider. In consequence, I would reinstate the ruling of the trial court on this issue and allow Mrs. Rye to present evidence at trial of the disruption of her family planning, but only as a part of her claim of physical and emotional damages.

In summary, I believe that the Ryes should be able to proceed to trial on three of their claims: (1) whether Mrs. Rye's condition of Rh-sensitization has caused her harm in the form of a present physical injury; (2) whether Mrs. Rye's Rh-sensitization has caused her harm in the form of emotional distress; and (3) whether Mrs. Rye's Rh-sensitization is reasonably certain to cause her prospective harm related to future pregnancies. I would allow the Ryes to present evidence of the disruption of their family planning, but only as a part of their alleged physical and emotional damages. By granting summary judgment on these three issues, my colleagues have deprived the Ryes of any opportunity to have their claims resolved on the merits by a jury of their peers. In consequence, the Defendants responsible for failing to comply with the recognized standard of care in the profession cannot be held accountable.

### III. Separation of Powers

Because I would have upheld the principles established in *Byrd* and refined in *Hannan*, I have chosen to generally address, without attempting to resolve, the constitutional issue which has been preempted by the decision of my colleagues to overrule the *Byrd/Hannan* standard in this case, a case which predated the passage of Tennessee Code Annotated section 20–16–101 purporting to change the summary judgment standard in Tennessee. *See* Matthew R. Lyon & Judy M. Cornett, *Hannan, The "Zombie Case": Will the Tennessee Supreme Court Drive a Stake Through Its Heart?*, Dicta, Dec. 2014, at 13 (questioning why the Court would grant review in *Rye*, other than to "moot any constitutional challenge to [section 20–16–101]," because "the *Hannan* standard is already on its way out" and "[t]he lower courts seem to be applying both Hannan and the statute appropriately").[18]

The Federalist Papers, a collection of eighty-five essays authored by Alexander Hamilton, James Madison, and John Jay, were designed to influence the states' adoption of the U.S. Constitution. Federalist Paper No. 78, far and away the most cited of the papers by the U.S. Supreme Court, lays the groundwork for the powers granted to the judiciary and broadly addresses the powers of each of the three branches of government:

> Whoever attentively considers the different departments of power must per-

---

18. In his separate opinion, Justice Bivins attempts to minimize the separation-of-powers issue by asserting that if the underlying motive of the majority really is to acquiesce to the summary judgment standard adopted by the General Assembly, it would "have been much easier to avoid this case and simply affirm the constitutionality of ... section 20–16–101 in an ultimate constitutional challenge." That statement is troubling. Initial-

ly, it is always easier to avoid a constitutional challenge than to address the claim on the merits. Secondly, his assertion that the Court could "simply affirm the constitutionality of ... section 20–16–101" is indicative of the belief that this Court can reach whatever result it desires in any given case—a notion disconcerting to anyone who believes that a fundamental obligation of this Court is to apply the established rule of law.

ceive, that, in a government in which they are separated from each other, the judiciary, from the nature of its funcions, will always be the least dangerous, to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them. The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments.

This simple view ... proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks. It equally proves, that though individual oppression may now and then proceed from the courts of justice, the general liberty of the people can never be endangered from that quarter ... so long as the judiciary remains truly distinct from both the legislature and the Executive.... "[T]here is no liberty, if the power of judging be not separated from the legislative and executive powers." ... [F]rom the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its coordinate branches....

The complete independence of the courts of justice is peculiarly essential in a limited Constitution[,] ... one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex-post-facto laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

*The Federalist* No. 78 (Alexander Hamilton).[19]

The U.S. Constitution served as a model for the founders of the Tennessee Constitution, which even more specifically contemplates a balance of powers among our three branches of government. Article II, section 1 provides, "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Article II, section 2 elaborates, "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." While there are no precise lines of demarcation in the respective roles of our three branches of government, the traditional rule is that "the legislative [branch has] the authority to make, order, and repeal [the laws], the executive ... to administer and

---

19. "The dignity and stability of government in all its branches, the morals of the people, and every blessing of society depend so much upon an upright and skillful administration of justice, that the judicial power ought to be distinct from both the legislative and executive, and independent upon both.... " John Adams, *Thoughts on Government* (1776), reprinted in 4 *The Works of John Adams* 198 (Charles Francis Adams ed., 1851), *available at* http://oll.libertyfund.org/titles/2102.

enforce, and the judicial ... to interpret and apply." *Underwood v. State,* 529 S.W.2d 45, 47 (Tenn. 1975) (quoting *Richardson v. Young,* 122 Tenn. 471, 125 S.W. 664, 668 (1910)). By the terms of our constitution, "[o]nly the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state, and this inherent power 'exists by virtue of the [Constitution's] establishment of a Court and not by largess of the legislature.'" *State v. Mallard,* 40 S.W.3d 473, 480–81 (Tenn. 2001) (citation omitted) (quoting *Haynes v. McKenzie Mem'l Hosp.,* 667 S.W.2d 497, 498 (Tenn. Ct. App. 1984)). In this context, "this [C]ourt is supreme in fact as well as in name." *Barger v. Brock,* 535 S.W.2d 337, 341 (Tenn. 1976).

Based upon these principles, but taking into account considerations of comity among the three branches of government, this Court has exercised measured restraint by repeatedly holding that "[a] legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of government." *Lynch v. City of Jellico,* 205 S.W.3d 384, 393 (Tenn. 2006) (alteration in original) (quoting *Underwood,* 529 S.W.2d at 47). "It is only by remembering the limits of the power confided to the judicial department of the government, and respecting the independence of the other departments, that the judiciary can maintain its own independence in the proper sense of the term[.]" *State ex rel. Robinson v. Lindsay,* 103

Tenn. 625, 53 S.W. 950, 952 (1899). Thus, this Court will typically consent to rules of procedure that are promulgated by the legislature as long as they "(1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court." *Mallard,* 40 S.W.3d at 481.

If the majority had maintained the viability of the *Byrd/Hannan* standard, this Court would have eventually been called upon to determine whether Tennessee Code Annotated section 20–16–101 is reasonable and workable within the burden-shifting framework articulated in *Byrd, Hannan,* and the many other opinions of this Court over the last twenty-two years, and whether the statute works to supplement those summary judgment rules already promulgated by this Court. *See, e.g., Cooper v. Robert Ledford Funeral Home, Inc.,* No. E2013–00261–COA–R10–CV, 2013 WL 3947758, at *3 n.5 (Tenn. Ct. App. July 29, 2013) (applying section 20–16–101 but noting the "unraised question as to the constitutionality of [the statute]"). By using the Ryes' case to overrule Hannan and adopt the federal standard, my colleagues have preempted any future consideration of this important constitutional question. In consequence, we are unable to address the issue of whether the General Assembly has created or amended a rule of procedure in such a way that "strike[s] at the very heart of [this] [C]ourt's exercise of judicial power." *Mallard,* 40 S.W.3d at 483.[20]

**20.** Although the majority insists that "[b]y our decision in this appeal we cannot preempt a constitutional challenge to a statute that does not apply in this appeal," this is precisely what has occurred, regardless of whether that was the intended result. By granting review in this case, overruling the common law as relied upon by the parties and the courts, and retroactively applying the federal standard as adopted by the General Assembly years after the events underlying the Ryes' claim, the majority has indeed sidestepped consideration of whether the legislature's enactment of this procedural rule would pass constitutional scrutiny.

"The same rule that teaches the propriety of a partition between the various branches of power, teaches us likewise that this partition ought to be so contrived as to render the one independent of the other." *The Federalist* No. 71 (Alexander Hamilton). I fear that today my colleagues have preempted our consideration of this important principle by surrendering the constitutional authority of this Supreme Court to establish summary judgment standards for the judiciary. *See* Judy M. Cornett & Matthew R. Lyon, *Contested Elections as Secret Weapon: Legislative Control over Judicial Decision-making*, 75 Alb. L.Rev. 2091, 2095–98 & n.33 (2012) (describing "an inter-branch game of 'chicken'" being played out between the General Assembly and the Tennessee Supreme Court over the issue of who has the power to determine the summary judgment standard for Tennessee). The fundamental responsibility of an independent judiciary is to protect against the unwarranted intrusion of the legislative branch. I would reaffirm the ruling in Hannan and, if raised in a future case, confront head-on the separation-of-powers issue.[21]

## IV. Conclusion

Because the *Byrd/Hannan* standard embraces the basic principle of resolution of disputes on the merits and the constitutional right to trial by jury, the Tennessee rule is preferable to that adopted by our federal courts in *Celotex*. Under either standard, however, I believe that three components of the Ryes' complaint should proceed to trial. Through inadvertence or otherwise, the majority has inappropriately weighed the evidence at the summary judgment stage and deprived the Ryes of a trial on the merits of their claims.

---

21. Contrary to the assertions in the separate opinion filed by Chief Justice Lee, I have not suggested that the Court maintain the *Byrd/Hannan* standard for the purpose of manufacturing a separation-of-powers issue.

In my view, the General Assembly created the separation-of-powers issue, and the majority's abandonment of a workable summary judgment standard compromises, rather than upholds, the independence of the judiciary.